# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

TOMMIE TELFAIR,                          :
                                         :     Civil Action No. 13-6585 (SDW)
                    Petitioner,          :
                                         :
            v.                           :          **OPINION**
                                         :
UNITED STATES OF AMERICA,                :
                                         :
                    Respondent.          :

**WIGENTON**, District Judge:

Presently before the Court is the motion of Tommie Telfair ("Petitioner") to vacate, set aside, or correct his February 2010 conviction. (ECF No. 1). Petitioner filed his motion on or about October 25, 2013. (ECF No. 1). The Government filed a response (ECF No. 20), to which Petitioner has replied. (ECF Nos. 24-25). Also before this Court are Petitioner's motion for the appointment of counsel (ECF No. 26-28), to which the Government responded (ECF No. 29), and in support of which Petitioner filed a reply (ECF No. 30-31); and Petitioner's motion for release on bail, to which the United States has responded. (ECF No. 34). For the following reasons, this Court will grant Petitioner's request for an evidentiary hearing solely as to his *Miranda* claim, will grant Petitioner's motion for the appointment of counsel solely for the purposes of the evidentiary hearing, deny Petitioner's motion for release on bail, deny all of Petitioner's remaining grounds for relief, and deny Petitioner a certificate of appealability as to all of his non-*Miranda* claims.

## I. BACKGROUND

Petitioner, Tommie Telfair, seeks in his current motion brought pursuant to 28 U.S.C. § 2255 to challenge his February 2010 conviction for conspiracy to distribute and possession with the intent to distribute one kilogram or more of heroin. In its decision affirming Petitioner's

conviction, the Third Circuit Court of Appeals provided the following summary of the facts

underlying Petitioner's conviction:

> On September 5, 2006, the Newark Police Department received a
> call that shots had been fired at 185 Parker Street, Newark, New
> Jersey.     Jennifer Filpo ("Filpo") and Catherine Sanchez
> ("Sanchez"), two of the occupants of 185 Parker Street, were at the
> residence when police arrived, and informed the police that they had
> called 911 because someone shot at the rear of the residence.  Filpo
> and Sanchez allowed the police into the residence.   The police
> proceeded to the kitchen area in the rear of the premises, where they
> found bullet holes in the door between the kitchen and the backyard,
> and damage from gunfire in the kitchen.   Detectives from the
> robbery unit arrived and found shell casings in the backyard near the
> kitchen door.  Detective Pablo Gonzalez noticed bullet holes on the
> refrigerator, and opened it in search of evidence of the shooting.
> Inside the refrigerator, he saw a projectile and, in a separate drawer,
> two clear containers holding what appeared to be heroin.  The
> detective seized the containers and performed a field test on the
> substance.  The substance tested positive for heroin.
>
> Detective Luigi Corino noticed a bullet hole in the kitchen
> floor, and traced the trajectory to locate the projectile. He concluded
> the bullet traveled into the basement.   After asking Filpo and
> Sanchez how to get into the basement, the detective followed the
> bullet's trajectory and discovered that it had traveled into a room that
> was behind a locked door.  After Filpo and Sanchez indicated they
> did not have a key to that door, Corino forced it open. Behind the
> door, Corino discovered a heroin mill.[]
>
> Filpo and Sanchez were arrested and taken into custody. In
> total, 130 grams of heroin were found at 185 Parker Street.
>
> The Drug Enforcement Administration ("DEA") was
> notified that a heroin mill had been found at 185 Parker Street.  DEA
> agents interviewed Filpo and Sanchez, who both identified
> [Petitioner] as the owner or controller of the heroin mill.  The DEA
> obtained a warrant to search 185 Parker Street for drug evidence and
> for evidence linking [Petitioner] to the premises.  When DEA agents
> executed the warrant, they collected the drug evidence from the
> basement and seized documentary evidence connecting [Petitioner]
> to the location.[1]

---

[1] The evidence in question included "rent receipts for 185 Parker Street in the name of 'Tommy
Hassan' (another of [Petitioner]'s aliases); a receipt for "Hass" (another alias) for rims for a 1998

Shortly after the shooting, the DEA attempted to find [Petitioner] at the residence of his girlfriend, Catrina Gatling ("Gatling"), but she denied knowing [Petitioner]. The DEA then obtained an arrest warrant for [Petitioner]. On January 23, 2007, [Petitioner] was arrested outside Gatling's residence. After he was Mirandized, [Petitioner] admitted he was a heroin dealer, and told the DEA agents that he had been leaving to meet his heroin supplier, Carlos Alberto Antigua ("Carlito"), when he was arrested. Carlito repeatedly called [Petitioner] during the interview.

Carlito testified at trial that he began supplying heroin to [Petitioner] in late August 2006. At the height of the relationship, [Petitioner] was purchasing 100 bricks of heroin every three days. This continued for roughly four months. During this period, Carlito sold between four and five kilograms of heroin to [Petitioner].

An indictment was returned against [Petitioner] on March 29, 2007, charging him with one count of conspiracy to distribute and to possess with intent to distribute 100 grams or more of heroin. A superseding indictment was filed on May 7, 2007, charging [Petitioner] with conspiracy to distribute one kilogram or more of heroin. On April 7, 2008, the District Court held a hearing regarding several motions filed by [Petitioner]'s then-counsel, James Kimball, including a motion to suppress the evidence seized from 185 Parker Street. The District Court denied the motions and issued a written order, without an accompanying opinion, on May 20, 2008. On October 7, 2008, this indictment was dismissed without prejudice due to violations of the Speedy Trial Act, 18 U.S.C. § 3161.

On October 8, 2008, a second indictment was returned against [Petitioner], charging him with one count of conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, and one count of distribution and possession with intent to distribute 100 grams or more of heroin.

---

Lincoln Navigator; a letter from DirecTV addressed to Hass Gatling at 185 Parker Street, Newark, New Jersey; three letters from Meg Radio to Hass Gatling at 185 Parker Street; a letter from Chase to Hass Gatling at 185 Parker Street; a letter from Cablevision to Hass Gatling at 185 Parker Street; a bill from Cablevision to Hass Gatling at 185 Parker Street; and a bill from Gold Touch Carpet and Flooring to Hass at 185 Parker Street. The owner and landlord of 185 Parker Street also testified that he had been renting the premises to [Petitioner] at the time the heroin was found, that [Petitioner] had made several renovations to the property, and that he had never informed the landlord of an intent to leave or to sublet the premises to Filpo and Sanchez." *United States v. Telfair*, 507 F. App'x 164, 167 n. 3 (3d Cir. 2012).

> Though represented by counsel, [Petitioner] filed a number of pro se motions, including a motion to suppress the evidence seized from 185 Parker Street, which were nearly identical to the motions filed under the prior indictment.  The District Court denied these motions in a December 10, 2008 opinion, noting it had denied "substantially similar" motions in its May 20, 2008 Order.  The court found the officers' warrantless entry of 185 Parker Street justified by the consent of Filpo and Sanchez.  The court also concluded the search was justified by the plain view exception to the warrant requirement.

> In March 2009, roughly one year before trial, Mr. Kimball was replaced by Michael Pedicini as counsel for [Petitioner]. [Petitioner] demanded that Mr. Pedicini file new motions on many of the same subjects and based on the same arguments as the earlier motions.  Mr. Pedicini declined, saying "my position with regard to motions is, if they've been filed and argued and denied, you can't refile them until you get the answer you want."

*United States v. Telfair*, 507 F. App'x 164, 167-69 (3d Cir. 2012) (internal citations and footnotes omitted), *cert. denied*, 134 S. Ct. 167 (2013).

Petitioner's matter proceeded to trial in February of 2010 following multiple extensions requested by Petitioner.  (*See* Docket No. 08-757 at ECF No. 67 at 20-23).  On the eve of trial on February 16, 2010, Petitioner brought to the trial court's attention that he believed that his counsel was acting improperly by failing to file new motions as discussed above and by failing to review the discovery with him.  (*See Id.* at 18-41).  In a lengthy colloquy, the trial court explained to Petitioner that the court would not entertain any more repetitive motions by Petitioner, and would not force Mr. Pedicini to file motions which counsel asserted had already been addressed during prior counsel's representation of Petitioner.  (*Id.*).  During that colloquy, Mr. Pedicini and the Government both addressed Petitioner's claim that he had not been provided discovery, and noted that Petitioner had received all of the discovery well in advance of trial, and that Mr. Pedicini had repeatedly spent significant amounts of time trying to go over the discovery with Petitioner, but was often prevented from doing so by Petitioner's insistence on filing new motions and, in at least

one instance, by violent outbursts on Petitioner's part when Mr. Pedicini's investigation showed that the facts did not match Petitioner's assertions.  (*Id.* at 7, 14-17, 32-41).  Although the Court accepted Mr. Pedicini's assertion that he had reviewed the discovery with Petitioner, the Court offered to provide Petitioner with a short recess of approximately one hour to go through the discovery with Mr. Pedicini, which apparently amounted to a single binder containing various DEA reports and the like.  (*Id.* at 40-41).  Petitioner, however, refused that offer, stating that he didn't believe such a review would be of any benefit.  (*Id.*).

During that same pre-trial presentation, defense counsel also sought permission to present polygraph evidence at trial through an expert witness purportedly to buttress Petitioner's credibility.  (*Id.* at 47).  Following argument, the trial court denied that request, excluding the polygraph evidence.  (*Id.* at 51-52).  In so doing, the trial judge made the following comments:

> Normally when something like this is offered with an individual with this alleged scientific knowledge, the Court would look to *Daubert v. Merrill Dow*[, 509 U.S. 579 (1993),] that famous 1993 case dealing with the admissibility of experts and the role the Court plays as a gatekeeper in doing so, basically holding that the expert testimony may be admissible even if not generally accepted in the relevant scientific community provided that it qualifies in some other way as reliable under Rule of Evidence 702, the rule pertaining to experts.
>
> I would note that most of our appellate courts that have discussed polygraphs since *Daubert* have ruled against admitting that type of evidence.
>
> I'm going to deny the application.  I just believe there are too many aspects of this that create unreliability.
>
> I recognize that there's no specific Third Circuit precedent. That's within the discretion of this Court.  I don't know whether or not the results of this could confuse the jury, but I think there is the potential to mislead the jury.
>
> And I do believe that the tests are just inherently unreliable and warrant exclusion.

(*Id.* at 50-51).

Trial commenced the following day.  At trial, the Government first called Pablo Gonzalez, a member of the Newark Police Department.  (Docket No. 08-757 at ECF No. 68 at 24).  Gonzalez testified at length regarding the call in reference to the shooting at 185 Parker Street and the search of the Parker Street home which resulted in the discovery of heroin in the refrigerator.  (*Id.* at 25-58).  The Detective also provided the foundation for the admission of various photographs showing the bullet holes in the door and kitchen of the home.  (*Id.*).  Finally, the Detective discussed the initial interviews of Sanchez and Filpo which resulted in a search for Petitioner.  (*Id.*).  Following Detective Gonzalez, the Government called Detective Luigi Corino of the Newark Police Department, who recounted his discovery of the drug mill in the Parker Street Home during his search thereof as recounted in the Third Circuit's opinion.  (*Id.* at 68-76).

The Government next called DEA agent Matthew Greimel.  (*Id.* at 76).  Greimel testified as to the purpose and function of a drug mill, and regarding his interview of Filpo and Sanchez. (*Id.* at 82-87).  Greimel testified that Filpo and Sanchez both identified the same individual as the owner and operator of the drug mill found in the Parker Street home.  (*Id.* at 86).  He also testified that they ultimately identified Petitioner as the individual who operated the drug mill through a photo array.  (*Id.* at 87-88).  Counsel for Petitioner did not object to the information regarding the identification of Petitioner via a photo array.  (*Id.*).  Greimel admitted, however, that both Filpo and Sanchez had lied to the Government regarding other facts involved in the drug operation, and as a result had lost the benefit of their cooperation agreements.  (*Id.* at 183-84, 211-15).  Greimel further testified that phone records showed the two women communicated with Petitioner under the name "Haz" through a telephone account registered to Petitioner's paramour.  (*Id.* at 89-101). The agent also testified about the multitude of clothing and shoes found in the Parker Street home

and documents found therein addressed to Petitioner under the names "Tommy Hassan, Hass Gatling, Son Gatling, [and] Tommie Telfair." (*Id.* at 102-135). Finally, the agent testified regarding Petitioner's arrest, and how a phone call placed to Petitioner's phone during the arrest ultimately resulted in the arrest of Petitioner's co-conspirators, Carlos A. and Jose Antigua. (*Id.* at 157-64).

Following Agent Greimel's testimony, the Government called Petitioner's landlord, Antonio Rodriguez. (*Id.* at 216). Mr. Rodriguez testified that he had rented the Parker Street home to Petitioner, and that Petitioner had ultimately promised to pay rent for the location through the time of the shooting. (*Id.* at 216-239). Mr. Rodriguez also testified that Petitioner had promised to pay for any damages resulting from the search of the home, which Petitioner told him was the result of the police breaking into the home. (*Id.* at 238-39). Finally, Mr. Rodriguez testified that Petitioner had never informed him of an intent to move out of the Parker Street address, but instead continued to assert that he would pay the back rent and continue with his lease even after the search of the home. (*Id.* at 238-40). After the testimony of Petitioner's landlord, the Government and Petitioner entered a stipulation that the drugs seized from the Parker street home included 154 grams of heroin with traces of cocaine and other drugs, as well as 5.6 grams of heroin in a chloride form. (Docket No. 08-757 at ECF No. 69 at 300-01).

The Government then called Carlos A. Antigua[2] to testify with the aid of a Spanish interpreter. (*Id.* at 310). Antigua testified that he had supplied Petitioner with several hundred bricks of heroin a week for several months. (*Id.* at 326). In total, Antigua testified that he supplied Petitioner with between four and five kilograms of heroin. (*Id.* at 237). Antigua also testified that

---

[2] For the sake of clarity, Carlos A. Antigua is herein referred to as Carlos Antigua, while Carlos Jose Antigua is instead referred to as Jose Antigua.

7

on at least one occasion, Petitioner had paid for a shipment of drugs by giving Antigua a car.  (*Id.* at 330-32).  During his testimony, Carols Antigua testified that several pages of his ledger showed transactions between himself and Petitioner, including the one in which Petitioner paid by way of giving Carlos Antigua a black Lexus automobile.  (*Id.* at 333-38).  When the pages of the ledger were introduced, counsel for Petitioner requested an opportunity to look at two of the three ledger pages because he didn't "have [two of the pages] in [his discovery] book."  (*Id.* at 333).  Upon seeing the pages, counsel stated that there was "no problem" and did not object to admission of the ledger pages.  (*Id.*).  Counsel did not say that he had never received the documents, only that he did not have them with him at trial.  (*Id.*).

Carlos Antigua then turned to testify regarding the events leading up to his arrest.  (*Id.* at 340).  Carlos Antigua stated that he was arrested after going to meet someone who was purportedly Petitioner's cousin, who in fact was an undercover DEA agent.  (*Id.*).  Antigua testified that he had spoken with the agent over the phone at least two times.  (*Id.*).  At that point, the Government sought to introduce recordings of these conversations into evidence, one of which was played for the jury, but was, according to defense counsel and the trial judge, inaudible.  (*Id.* at 341-46). When the Government thereafter tried to enter into evidence purported transcripts of the recording, counsel for Petitioner objected.  (*Id.*).[3]  The trial court ultimately determined that the recordings, and a related video recording of the agent meeting with Carlos Antigua, were unduly prejudicial hearsay, and thus excluded them from evidence.  (*Id.* at 347-53).

Carlos Antigua then testified that he met with an undercover DEA agent on several occasions.  (*Id.* at 354).  When the Government sought to ask Antigua about the conversations that

---

[3] Petitioner's trial attorney had previously objected to these recordings prior to trial, and the trial judge had withheld his decision at that time.  (*See Id.* at 347).

took place during those meetings, defense counsel objected on the grounds that this amounted to inadmissible hearsay as the meetings took place after Petitioner's arrest and could therefore have not been in furtherance of the conspiracy in which Petitioner was involved.  (*Id.* at 355-363).  The trial judge initially concluded that defense counsel was correct, and thus said that he would preclude the Government from discussing those conversations with the witness.  (*Id.* at 363).  When the Government disputed this ruling, the trial judge stated that he would permit the Government to discuss the hearsay, but warned that doing so would likely result in an appeal of any conviction.  (*Id.* at 364).  The Government thereafter dropped the line of questioning, and chose not to discuss the alleged hearsay further, despite permission to do so.  (*Id.* at 365-66).

Defense counsel cross examined Carlos Antigua at length regarding his cooperation agreement with the Government.  Specifically, counsel elicited information that, even though Antigua had distributed some ten or more kilograms of heroin, he pled guilty to only distributing 100 grams of heroin.  (*Id.* at 377-82).  Counsel likewise got Antigua to admit that Antigua had some expectation of receiving a letter requesting a downward sentencing departure in exchange for his testimony against Petitioner.  (*Id.* at 380-82).  Antigua also stated on cross examination that he had met with the Government on several occasions to prepare for his testimony in Petitioner's case.  (*Id.* at 387).

The Government thereafter called Carlos Jose Antigua, the brother of Carlos A. Antigua, to testify.  Jose Antigua testified that he had acted as a go between for his brother and Petitioner, and had delivered heroin to Petitioner on his brother's behalf.  (*Id.* at 416-21).  Jose Antigua also testified that on one occasion, he had delivered heroin to Petitioner in exchange for the black Lexus as had been recounted in his brother's testimony.  (*Id.* at 422-23).  Jose further testified that his last delivery to Petitioner had been in January of 2007, a few weeks before Petitioner's arrest.  (*Id.*

at 424-25).  As with his brother, Jose Antigua was cross examined extensively on his cooperation agreement with the government and the resulting sentencing benefits he would receive in return for his cooperation.  (*Id.* at 447-48).

The Government next called Craig Ford, who testified that he was a longtime friend of Petitioner.  (*Id.* at 452-56).  Ford testified that he and Petitioner had met at the Parker Street home multiple times during June of 2006.  (*Id.* at 457).  Ford further testified that when he and Petitioner went to the Parker Street home, they met with Filpo and Sanchez, who were staying in the home.  (*Id.* at 462-63).  Ford also testified that he had at one point discarded a bag containing numerous empty heroin bags on Petitioner's behalf.  (*Id.* at 465).  Ford then testified that he later met with Petitioner at the Parker Street home, and at that time he observed Petitioner with a large bag containing "eight hundred-some grams" of heroin which Ford saw Petitioner weigh.  (*Id.* at 465-66).  Ford explained that he and Petitioner took this bag of heroin to New York where Petitioner attempted to return the heroin to the person from whom he'd bought it.  (*Id.* at 467).  Ford also testified that Petitioner had told him about the shooting at Parker Street, and that Filpo and Sanchez had called Petitioner and told him to come to the house after the shooting occurred.  (*Id.* at 468-69).  Ford testified that Petitioner told him that he rode by the house to see what had happened, saw the police, and left the scene.  (*Id.* at 471).

Ford also stated that, a few days after the shooting incident, Ford accompanied Petitioner back to the Parker Street home, where Petitioner paid several movers for moving the clothing and shoes out of the Parker Street location.  (*Id.* at 473-74).  Ford then testified that, the following day, he and Petitioner took a U-Haul and Petitioner had Ford and another man "clean[] out the basement" by removing empty heroin bags and drug paraphernalia and wiping down the tables and walls.  (*Id.* at 475; Docket No. 08-757 at ECF No. 70 at 532-33).  Ford also testified that he

had removed a few handguns from a secret compartment under the refrigerator in the kitchen of the Parker Street home.  (Docket No. 08-757 at ECF No. 69 at 476).

The Government next called DEA Agent Gregory Arthur Hilton.  (Docket No. 08-757 at ECF No. 70 at 548).  Agent Hilton testified that after Petitioner's initial interview at his home and arrest, Petitioner was brought back to the DEA office in Newark New Jersey.  (*Id.* at 551).  Agent Hilton further stated that although he was not initially part of that interview, he joined the interview after it had begun.  (*Id.*).  Hilton was apparently asked to join the interview by his supervisor because Hilton possessed knowledge of many of the drug traffickers active in the Newark area.  (*Id.* at 551-52).  Hilton testified that, while he was present, Petitioner told the DEA agents conducting the interview, Agents Thompson and Post, that his main supplier was Carlos A. Antigua, and that Antigua had been his chief supplier since 2006.  (*Id.* at 553).  Hilton further stated that Petitioner had previously dealt with another supplier, Fausto Paulino, and that Paulino had been providing Petitioner with up to five hundred and fifty bricks of heroin per week during the two years Petitioner had worked with him, with each brick weighing approximately 2.5 grams.  (*Id.* at 553-55).  Agent Hilton then testified that Petitioner had permitted Filpo and Sanchez to stay in his Parker Street Home as a favor to Paulino.  (*Id.* at 555).  Hilton also testified that Petitioner claimed that he was not involved with the drug operation at the Parker Street home, although Petitioner admitted the clothing and the like in the home were his.  (*Id.* at 556-57).

Agent Hilton also testified that he was the undercover agent who had interacted with Carlos Antigua.  (*Id.* at 551).  Hilton stated that, during the interview of Petitioner, he was given Petitioner's phone and was instructed to answer an incoming phone call from Carlos A. Antigua.  (*Id.* at 550-51).  Hilton testified that he was also instructed to lead Antigua to believe that Hilton

was a part of Petitioner's drug operation, which he did, ultimately resulting in the meetings with and arrest of the Antigua brothers.  (*Id.* at 551).

The Government's final witness was DEA Agent John Post.  (*Id.* at 564).  Agent Post testified that, on January 23, 2007, in response to a report that Petitioner had been spotted at the home of his wife, he and other agents surveilled the wife's home.  (*Id.* at 565-66).  At approximately 3 p.m. that afternoon, Agent Post and his team saw Petitioner exit the home.  (*Id.* at 567).  Agent Post then approached Petitioner, identified himself, and told Petitioner that he was under arrest as Petitioner was walking towards his vehicle.  (*Id.* at 567-68).  Agent Post described Petitioner's demeanor at that time as follows:

> He was very cooperative.  When we arrest an individual like [Petitioner], initially, what we hope to do is get his cooperation.  We asked him if he'd like to go back into his house to talk to us.  He said he would.  We did not handcuff him at the time.  We walked him back to his residence.  He had the keys to get into the house, and there was an alarm system at the door entrance.  He keyed the alarm, opened the door, and we went into the residence.
>
> [Agent Post explained that the DEA generally attempts to obtain cooperation from drug trafficking suspects in the hopes of gaining information on their superiors, suppliers, and co-conspirators.]
>
> . . . .
>
> He agreed to talk to – initially, when we got him back in the apartment, sat him on the couch, I *Mirandized* him, and he agreed to continue talking to us.
>
> . . . .
>
> I told him he had the right to remain silent; anything he said could and will be used against him in a court of law; that he had a right to an attorney to be present with him during questioning if he so opted; if he couldn't afford an attorney, he could be provided with one.

[(*Id.* at 568-69).]  Agent Post further testified that Petitioner stated that he understood those rights, was "very lucid [and] very cooperative," and gave the agent no reason to believe that he did not

understand his rights.  (*Id.* at 570).  Agent Post testified that Petitioner at no time stated he was in

any pain or needed/was headed to see a doctor, and that Petitioner was not handcuffed until the

initial interview ended and Petitioner was taken to the DEA's office in Newark.  (*Id.* at 581-83,

594-95).

Agent Post testified that among the items found on Petitioner's person at the time of his

arrest were three cell phones, one of which Petitioner used to conduct his drug business.  (*Id.* at

570-73).  Although Petitioner initially stated that he had not spoken with anyone on this business

phone on the day of his arrest, Petitioner admitted after being told his phone was being monitored[4]

that he had "recently spoken to his friend [Carlos A. Antigua]."  (*Id.* at 573).  Petitioner then

identified Carlos Antigua as his heroin supplier.  (*Id.* at 574).  Agent Post testified that when he

looked at Petitioner's phone it was locked, and he asked Petitioner if he could look at the phone,

at which point he handed the phone to Petitioner who entered his private code, unlocked the phone,

and gave it back to Agent Post.  (*Id.*).  Petitioner's phone confirmed that Petitioner's most recent

call had been to Antigua.  (*Id.*).  Post further testified that, during the conversation, Carlos Antigua

called Petitioner's cell phone.  (*Id.* at 574-75).  Petitioner further explained to post that Antigua

had told him that he had "good news" for him – meaning that Antigua either had or would soon

have heroin for Petitioner – and that Petitioner had been on his way to see Carlos Antigua when

he was arrested.  (*Id.* at 574-81).

Agent Post then testified that he attempted to gain Petitioner's cooperation against Antigua.

Petitioner apparently told Post that he would call Antigua to calm him, but only if he could call his

girlfriend first, which Post would not allow him to do.  (*Id.* at 581-82).  Petitioner thereafter refused

to call Carlos Antigua for the DEA, and stated that he would not cooperate in an attempt to arrest

---

[4] Petitioner's phone was subject to a United States Marshals' pen register.  (*Id.* at 573).

Antigua, but was amenable to continuing to talk with the DEA.  (*Id.* at 583).  Petitioner was at that

point handcuffed and taken to the DEA's Newark office.  (*Id.*).  Agent Post also confirmed that

Petitioner had, during questioning at the DEA's office, provided the information about which

Agent Hilton had testified regarding his previous supplier, Filpo, Sanchez, and Petitioner's claim

that the women were using his Parker Street home to sell drugs.  (*Id.* at 584-88).

On cross examination, Agent Post again confirmed that Petitioner never said he was in

pain, had an injured hand, or that he was on his way to see a doctor.  (*Id.* at 595-95).  Post also

confirmed that he provided Petitioner with proper *Miranda* warnings, which Petitioner waived.

(*Id.* at 597).  When asked why there was not a signed *Miranda* waiver form, Agent Post testified

that it was not the standard procedure of the DEA at that time to require a signed waiver form.

(*Id.*).

Following the testimony of Agent Post, the United States rested its case, and counsel made

a Rule 29 motion for a judgment of acquittal, which the trial judge denied.  (*Id.* at 612-13).  Defense

counsel was then given a brief period of time during which to speak with Petitioner, who ultimately

chose not to testify in his own defense.  (*Id.* at 614-15).  Petitioner called no witnesses in his

defense, and rested on counsel's cross examinations of the Government's witnesses.  (*Id.* at 615-

16).

During its summation, the Government made the following statements in response to the

cross-examination of Craig Ford and in anticipation of defense counsel's attack on Ford's

credibility, (*see id.* at 646-47), which Petitioner alleges constituted improper vouching:

> It's not about whether anyone would want to have dinner with Craig
> Ford.  Craig Ford came here.  He did so under compulsion of
> subpoena.  You observed his testimony.  The Government submits
> that Craig Ford's testimony was perhaps as credible as could be.  He
> had no incentive whatsoever.  All this talk about cooperation
> agreements?  Didn't happen.  Didn't have any pending charges.

> Wasn't getting anything from his testimony.  He came here, and you saw how difficult it was for him.  He's known [Petitioner] for 30 years.  Yet he pierced each one of the defenses raised by [Petitioner].

(*Id.* at 635-36).

In response to defense counsel's argument that Petitioner had consistently argued that he never made any statements to Agents Post and Hilton about Carlos Antigua or his other suppliers, and had simply denied any involvement with the Parker Street home's drug contents, the Government made the following comments in its rebuttal summation, which Petitioner also asserts amounted to improper vouching:

> So that's the defense you're to consider: everybody lied.  Mr. Telfair has maintained, I didn't say those things.
>
> So Special Agent Greg Hilton, over 20 years of experience, Special Agent John Post, involved in completely separate interviews with [Petitioner], both saying the same thing that he said – he's a huge heroin supplier, he's been so for a long time – would come here, put their careers on the line, jeopardize their nearly half a century combined of law enforcement experience to lie, to frame just another drug dealer, one of many they arrest every day?
>
> Does that make sense?  Is that a real defense here?  Is that consistent with all the evidence?
>
> So [Petitioner] didn't say all those things that are recorded in multiple detailed reports of what he said but just somehow turned out to be true.
>
> [Petitioner]:  I didn't say Fausto was my supplier for three years.
>
> So then why does Carlos Antigua come in here, never talked to [Petitioner] about that, and say, Yeah, [Petitioner] was being supplied by Fausto?  How do we know?  Because [Antigua testified that the drug trafficking organization for which Antigua worked] passed him from Fausto to Ruben to [Antigua].
>
> [Petitioner] says, well, I never did business with Tony.  I never said that to those agents.

15

> But somehow that's true.  How do we know that?  [Petitioner s]hows Carlos Antigua the basement of bad heroin.
>
> [Petitioner]:  I never said I had a running dispute with Tony over bad heroin.
>
> Mr. Antigua:  Yeah, he showed me bad heroin in the basement of 185 Parker Street.
>
> Mr. Ford:  Yeah, he showed me more than 700 grams of heroin we took to Washington Heights and we exchanged it.
>
> So when [Petitioner] says, I didn't say that: these agents made up statements [] completely out of the air that just happened to be true?  Does that make sense?

(*Id.* at 650-52).

Following summations and the jury instructions, the jury retired at 3 p.m. on February 19, 2010.  (*Id.* at 711).  The jury returned its verdict approximately 90 minutes later, finding Petitioner guilty of both counts of the indictment, and finding that Petitioner's conspiracy conviction had involved "one kilogram or more of a mixture or substance containing heroin" beyond a reasonable doubt.  (*Id.* at 715-16).

Between the verdict and sentencing, Petitioner again changed counsel, and was thus represented by John Azzarello at sentencing.  Although the trial court determined at sentencing that Petitioner was subject to a guidelines range of 360 months to life based on the quantity of heroin involved in his case and the armed career criminal enhancement to which Petitioner was subject based on his criminal history, Azzarello successfully persuaded the trial judge at sentencing that the enhancement overstated Petitioner's actual criminal history.  *See Telfair*, 507 F. App'x at 169.  As a result, the trial court granted Petitioner a downward departure and sentenced Petitioner to 240 months' imprisonment.  *Id.*  Petitioner thereafter filed a timely notice of appeal.  *Id.*

On appeal, Azzarello determined that, in his professional judgment, Petitioner's case did not present any meritorious basis for appeal, and therefore filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 744 (1967), with the Third Circuit arguing that all the apparent bases for an appeal were without merit. *Telfair*, 507 F. App'x at 169-70; *Anders*, 386 U.S. at 744 (holding that "if counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw . . . [t]hat request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal"). Although the Third Circuit found that counsel's *Anders* brief was inadequate in so much as it failed to address certain claims which Petitioner raised in his pro se briefs, the Third Circuit examined Petitioner's case in depth and determined that Petitioner's case presented no meritorious basis for an appeal. *Telfair*, 507 F. App'x at 171-79.

In making that determination, the Third Circuit considered and rejected Petitioner's arguments that the search of the Parker Street home violated the Fourth Amendment, that the second superseding indictment was deficient or embellished the facts, that the Government committed discovery violations, that the trial court should have granted certain motions for a mistrial, and that Petitioner's sentence was either unreasonable or the result of deficient process. *Id.* The Court also rejected Petitioner's attempts to bring ineffective assistance of counsel claims on direct appeal, finding that most of those claims went beyond the trial record and thus would only be cognizable on collateral review.[5] *Id.* at 175-76. The Third Circuit thus denied Petitioner's appeal, finding no meritorious issues in Petitioner's pro se filings or counsel's *Anders* brief. The Court also denied Petitioner's outstanding miscellaneous pro se motions and filings as equally

---

[5] The Third Circuit did review Petitioner's claim that Mr. Pedicini was ineffective in so much as he "conspired" to deprive Petitioner of his appellate rights, and rejected that claim as clearly without merit. *Id.* at 176 n. 17.

without merit.  *Id.* at 179.  Petitioner thereafter filed a petition for certiorari, which the Supreme Court denied on October 7, 2013.  *See Telfair v. United States*, --- U.S. ---, ---, 134 S. Ct. 167, *rehearing denied*, --- U.S. ---, ---, 134 S. Ct. 815 (2013).

## II.  DISCUSSION

### A.  Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence.  Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255.  Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure."  *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

**B.  Analysis**

**1.  An evidentiary hearing is required only for Petitioner's *Miranda* claim and counsel will be appointed for the hearing on that claim**

A district court need not hold an evidentiary hearing on a motion to vacate where "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b); *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005); *United States v. Day*, 969 F.2d 39, 41-42 (3d Cir. 1992).  "Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required." *Judge v. United States*, --- F. Supp. 3d ---, ---, No. 13-2896, 2015 WL 4742380, at *3 (D.N.J. Aug. 11, 2015); *see also Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985); *see also United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*, 432 F.3d at 546.  For the reasons set forth below, all of Petitioner's claims other than his *Miranda* claim are without merit, and will therefore be denied without an evidentiary hearing. Because this Court cannot decide Petitioner's *Miranda* based claim based solely on the record at hand, including the transcripts of the hearing now-retired Judge Cavanaugh held as to Petitioner's suppression motion, Petitioner will be provided with an evidentiary hearing limited solely to his *Miranda* claim.  Because this Court is granting Petitioner a hearing as to that claim, Rule 8 of the Rules Governing Section 2255 proceedings requires that this Court appoint counsel for Petitioner for that hearing, as such, Petitioner's motion for the appointment of counsel will be granted solely for the purpose of a hearing as to Petitioner's *Miranda* claim.

**2.  Petitioner's may not use his § 2255 motion to relitigate those matters decided adversely to him on direct appeal**

Petitioner attempts to raise several claims in his motion to vacate which have previously been decided adversely to him on the merits on direct appeal.  A § 2255 motion "is not a substitute for an appeal" and therefore cannot "be used to relitigate matters decided adversely on appeal." *Nicholas*, 759 F.2d at 1075.  As such, § 2255 "may not be employed to relitigate questions which were raised and considered on direct appeal." *United States v. DeRewal*, 10 F.3d 100, 105 n. 4 (3d Cir. 1993) (internal quotations omitted); *see also United States v Travillion*, 759 F.3d 281, 288 (3d Cir. 2014) ("issues resolved in a prior direct appeal will not be reviewed again by way of § 2255 motion").  Here, Petitioner attempts to assert claims that the searches and seizures conducted at 185 Parker Street violated his Fourth Amendment rights, and attacks the sufficiency of the indictment against him.  The Third Circuit, however, already decided those claims on the merits adversely to Petitioner on direct appeal.  *Telfair*, 507 F. App'x at 171-77.  Petitioner is therefore barred from raising those claims in his motion to vacate, and those claims present no basis for relief.[6]  *Travillion*, 759 F.3d at 288.

**3.  Petitioner's Speedy Trial Act Claim**

Petitioner alleges that the trial court erred in dismissing his indictment without prejudice in response to his second speedy trial act motion.  Petitioner argues that the indictment should have been dismissed with prejudice and the Government blocked from proceeding with the

---

[6] Although Petitioner insists that he is not relitigating the same issues and that he is instead addressing "new facts," he is in fact raising the same claims he raised on direct appeal: specifically that the evidence seized at 185 Parker Street should have been suppressed and that the indictment against him should have been dismissed.  The Third Circuit addressed both of those claims in its opinion, and as such Petitioner may not re-argue those points here.

second superseding indictment through which he was ultimately tried and convicted.          Under

the Speedy Trial Act, trial in a criminal matter "shall commence within seventy days from the

filing date . . . of the . . . indictment or from the date the defendant has appeared before a judicial

officer of the court in which the charge is pending, whichever date last occurs." 18 U.S.C.

§3161(c)(1). Courts exclude from that seventy day period many forms of pretrial delay

including any delays resulting from pretrial motions and any period of delay resulting from

continuances which the court finds are in the interest of justice at the time the continuances are

granted. *See* 18 U.S.C. § 3161(h)(1)-(7). In Petitioner's case, the pre-trial delay exceeded

seventy days by, at most, eighty four days.[7] (*See* Docket No. 07-272 at Document 1 attached to

ECF No. 64 at 4, 4 n. 1). That this eighty four day delay beyond the speedy trial period existed

mandated that the trial court dismiss Petitioner's original criminal case, but the statute does not

require that a criminal case be dismissed with prejudice for all violations of the Speedy Trial Act.

    The Speedy Trial Act permits trial courts to dismiss a criminal indictment with or without

prejudice following a violation of the act. *See* 18 U.S.C. § 3162(a)(1). "In determining whether

to dismiss the case with or without prejudice, the court shall consider, among others, each of the

following factors: the seriousness of the offense; the facts and circumstances of the case which

---

[7] This eighty four day period of delay includes both the twenty eight day excess found by the
trial court and fifty six days of delay granted by the trial court *nunc pro tunc*. *See United States v.
Brenna*, 878 F.2d 117, 122 (3d Cir. 1989) (an order continuing a case must be entered before the
days to be excluded). Although Petitioner argues that several of his lawyers requested delays he
didn't want, he has not specified which of the many continuances in this matter were unwanted,
instead providing only vague allegations that three of his lawyers sought continuances without
first receiving his permission, which he alleges he would not have given. As that allegation is
vague and conclusory, and Petitioner has not shown that he suffered ineffective assistance of
counsel as discussed below, this Court cannot and will not speculate as to additional excesses
based on allegedly improper continuances. Although Petitioner asserts that he was delayed by
over a year, he arrives at that calculation by essentially failing to remove from his calculation the
time accounted for by continuances sought by his attorneys or resulting from his filing of
numerous pretrial motions.

led to the dismissal; and the impact of a reprosecution on the administration of [the Speedy Trial Act] and on the administration of justice." *Id.* The presence or absence of prejudice to the criminal defendant is also a factor relevant to this determination. *See United States v. Martinez*, 75 F. Supp. 2d 360, 365 (D.N.J. 1999) (citing *United States v. Taylor*, 487 U.S. 326, 334-36 (1988)); *see also United States v. Cox*, 553 F. App'x 123, 129 (3d Cir. 2014).

A consideration of the relevant factors in this case clearly shows that the trial court took the correct course of action by dismissing Petitioner's indictment without prejudice. Turning first to the seriousness of the offense, Petitioner was charged with a conspiracy to distribute large amounts of heroin, a crime which carried with it a hefty potential sentence. Indeed, Petitioner himself admits that his was a serious offense. Turning to the facts and circumstances of Petitioner's case, it is clear that the delay in this case mostly arose out of Petitioner's many pre-trial motions, firing of his original attorneys, and the continuances requested by Petitioner and his attorneys. Those periods of time which were not excluded were, as noted by the trial court, brief gaps between the various motions and continuances and thus were not the result of any evident bad faith or dilatory practice on the part of the Government. Because there is no evidence of a pattern of continuance neglect, antipathy, or bad faith on the part of the Government, and much of the delay in this case arose out of Petitioner's actions, this factor would also weigh in favor of a dismissal without prejudice. *See Taylor*, 487 U.S. at 339-41; *see also United States v. Berberena*, No. 02-0587, 2008 WL 4083198, at *3 (E.D. Pa. Aug. 28, 2008).

Turning to the last two factors, it is clear that dismissal without prejudice was the correct sanction in this case. Petitioner attempts to allege that he was prejudiced by the delays in his case, and the Government benefited in so much as they were able to conduct further investigation

and better prepare Petitioner's case.  Petitioner, however, presents no real evidence in support of his claim that he was prejudiced by the delay.  Indeed, the delay here enabled Petitioner to raise several of his motions and to change his lawyer on multiple occasions, while simultaneously running the risk of damaging the Government's ability to prosecute petitioner in so much as time weakens memories and can cause evidence to become stale.  There is little, if any, evidence that the Government received any real benefit from the delays Petitioner caused, and the trial court, just before Petitioner's trial, specifically noted that many of the delays Petitioner requested were granted in the face of the Government's preparedness to proceed to trial.  (*See* Docket No. 08-757 at ECF No. 67 at 19-23).  Thus, there is no real evidence of prejudice to Petitioner, which cuts in favor of a dismissal without prejudice.  Based on the lack of prejudice, the seriousness of the offense, and the lack of evidence of bad faith or dilatory motive on the part of the Government, it clearly appears that the impact of reprosecution would not have a negative effect on the administration of justice or of the Speedy Trial Act as a dismissal without prejudice addressed the technical violation fairly.  Although a dismissal without prejudice is a less harsh sanction than one with prejudice, it is not "toothless."  *Taylor*, 487 U.S. at 342.  It is clear from the facts here that a dismissal without prejudice was more than sufficient to address the relatively minor speedy trial act violation in this case, and there is no support in the record for Petitioner's proposition that a dismissal with prejudice was necessary.  Thus, Petitioner is not entitled to relief based on his speedy trial claim.

#### 4. Petitioner's *Miranda* Claim[8]

Petitioner asserts that the trial court erred when it failed to suppress his alleged statement

to the police, and that it erred in not holding an evidentiary hearing on his motions to suppress

his statements.  Under *Miranda*, any statement made by a criminal defendant during custodial

interrogation is inadmissible at trial unless the defendant was provided *Miranda* warnings and

"in fact knowingly and voluntarily waived [his *Miranda*] rights when making the statement."

*Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010).  "The waiver inquiry has two distinct

dimensions: waiver must be voluntary in the sense that it was the product of a free and deliberate

choice rather than intimidation, coercion, or deception, and made with a full awareness of both

the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.*

(internal quotations omitted).  Waiver need not be made by express or formal statements, but

may be made by implication so long as the facts establish that the defendant was informed of his

rights to counsel and remain silent, understood those rights, and voluntarily made a statement

having that understanding.  *Id.* at 383.

In this case, it is clear that Petitioner was in custody at the time he made the statements he

now challenges, and it is likewise clear that he was under interrogation both in his home and at

---

[8] Petitioner asserts that his rights were violated in so much as his statements were allegedly taken
without *Miranda* warnings and after he had asked for an attorney during a pre-charge custodial
interrogation.  Petitioner also attempts to assert that this amounts to a violation of his rights
under *Massiah v. United States*, 377 U.S. 201 (1964) simply because he allegedly asked for a
lawyer during his interrogation.  Petitioner is incorrect.  A violation of *Massiah* only occurs
where a Defendant's Sixth, as opposed to Fifth, Amendment right to counsel has attached
through the filing of a formal charge, preliminary hearing, indictment, information, or
arraignment.  *See, e.g., United States v. Bergrin*, No. 09-369, 2011 WL 4368970, at *2-3 (D.N.J.
Sep. 19, 2011).  Here, the alleged violations took place during a custodial interrogation prior to
the filing of a charge or the like.  As such, Petitioner's Sixth Amendment right to counsel had not
yet attached at the time of his interrogation, and no violation of Petitioner's *Massiah* rights could
have occurred.

the DEA offices when he was being questioned by numerous DEA agents.  As it is clear that Petitioner was the subject of custodial interrogation, the *Miranda* rules apply, and his statements to the DEA would only be admissible if he was provided *Miranda* warnings, and made a knowing and voluntary waiver of his *Miranda* rights.  Here, all of the evidence in the record itself (as opposed to in Petitioner's certification) clearly indicates that Petitioner was provided with *Miranda* warnings and chose to give a statement regardless.  Indeed, Agent Post clearly testified that Petitioner was arrested, informed of his *Miranda* rights, and asked if he would like to make a statement.  Agent Post likewise testified that Petitioner at no time mentioned that he was in pain, needed a doctor, was under the influence, or gave any other impression than that he was lucid and cooperative, save for the fact that he did not wish to help the Government set up his heroin supplier.  Agent Hilton's testimony that Petitioner continued to be cooperative and answer questions after being taken back to the DEA offices likewise supports the conclusion that Petitioner knowingly and voluntarily waived his rights, and that the questioning on the day of Petitioner's arrest was calm and at least relatively amicable.  That the statement Petitioner gave to the DEA aligns with the facts as testified to by other witnesses, including the Antigua brothers and Craig Ford, further supports the conclusion that Petitioner did, indeed, give an inculpatory statement to the DEA following his arrest.  Thus, all of the evidence provided at trial supports the conclusion that Petitioner knowingly and voluntarily waived his rights and gave the statement testified to by Agent Post following his arrest.

In the affidavit attached to his § 2255 motion, however, Petitioner presents an entirely different story.  (Document 1 attached to ECF No. 1 at 4-7).  Petitioner alleges that it was Agent Greimel, and not Agent Post, who interviewed Petitioner, despite the fact that Greimel testified at trial that he was not present during the arrest or questioning of Petitioner.  Petitioner asserts

that he told the agents he was in pain and on the way to the doctor, but was instead arrested and immediately placed in handcuffs, contrary to testimony by Agent Post that Petitioner was not handcuffed until he was taken to the DEA office in Newark.  Petitioner asserts that he was thereafter threatened with the prosecution of his wife if he did not cooperate.  Petitioner asserts that he refused to cooperate with the DEA, and was never provided with *Miranda* warnings. Petitioner further asserts that when he refused to cooperate, Agent Greimel insisted that Petitioner would either give a statement, or one would be forged to incriminate Petitioner. Petitioner alleges that he continued to refuse, and the agents therefore forged his statement and arrested his wife.  Petitioner further asserts that, to the extent that he did answer questions asked by an Agent Thomas, the agents recorded false answers which in no way reflected the statements that Petitioner gave.  Petitioner further asserts that he requested an attorney, but was denied one by the DEA agents.  Petitioner finally asserts that, during a lull in the questioning, he heard his wife being questioned in another interrogation room, including insults hurled at Petitioner by the questioning agent.  Thus, Petitioner contends that he never received *Miranda* warnings, was in constant pain from an injured hand being handcuffed, was the subject of attempted coercion by Agent Greimel, and in any event never made the statement used against him at trial.  (*Id.* at 4-8).

While Petitioner's version of events certainly strains credulity and is clearly contradicted by much of the testimony in the record, including the testimony of Agents Post and Hilton regarding the interrogation, the testimony of Agent Greimel about being absent on the day of the arrest, and the testimony of the Antigua brothers and Craig Ford which would clearly corroborate the statement given by Petitioner to the DEA, it is clear that, if Petitioner properly presented the claims he now presents to the trial court, there was an apparent issue of fact regarding the statement that would arguably have needed resolution.

The trial court record establishes that Petitioner tried to raise a version of the complaint he now raises at least twice: once in a motion by his third attorney, John Kimball, filed prior to the speedy trial dismissal, and once in a substantially similar pro se motion filed after that dismissal, both of which the trial court denied.  In both instances, the trial court determined that Petitioner's legal arguments without the submission of an affidavit setting forth his version of events was insufficient to establish that an evidentiary hearing as to the voluntariness of Petitioner's statement was warranted.  Thus, the trial court denied the motions to suppress and left it to the Government to provide adequate proof at trial to demonstrate, by a preponderance of the evidence, that Petitioner waived his *Miranda* rights in giving his statement.  (*See* April 7, 2008 Hearing Transcript at 6-7).  As it is clear that the evidence produced at trial more than established by a preponderance of the evidence that Petitioner knowingly and voluntarily waived his *Miranda* rights, the ultimate question here is whether the trial court properly refused to hold an evidentiary hearing, and thereby prevented Petitioner from litigating his version of events without the attendant risks of testifying on his own behalf at trial.

Although Rule 12 of the Federal Rules of Criminal Procedure requires that a motion such as Petitioner's motion to suppress be raised pretrial, it does not specify when a criminal defendant is entitled to a pretrial evidentiary hearing.  *See United States v. Voight*, 89 F.3d 1050, 1067 (3d Cir. 1996); *see also United States v. Foster*, 287 F. Supp. 2d 527, 529 (D. Del. 2003).  As the Third Circuit has explained, to warrant a hearing, a criminal defendant's

> moving papers must demonstrate a "colorable claim" for relief. *United States v. Brink*, 39 F. 3d 419, 424 (3d Cir. 1994) (remanding for hearing where Brink alleged facts that, if true, "could violate a defendant's rights under the Sixth Amendment")[; *see*] *United States v. Soberon*, 929 F.2d 935, 941 (3d Cir.) (If district court had "reasonable suspicion" of prosecutorial misconduct proper course was to hold evidentiary hearing), *cert. denied*, 502 U.S. 818 [(1991)].  In order to be "colorable" a defendant's motion must

27

> consist of more than mere bald-faced allegations of misconduct.
> *United States v. Sophie*, 900 F.2d 1064, 1071 (7th Cir.) ("A district
> court does not have to hold evidentiary hearing on a motion just
> because a party asks for one."), *cert. denied*, 498 U.S. 843 [(1990)].
> There must be issues of fact material to the resolution of the
> defendant's constitutional claim. *See United States v. Panitz*, 907
> F.2d 1267, 1273-74 (1st Cir. 1990) (refusal to hold evidentiary
> hearing on outrageousness claim proper because material facts were
> not in dispute); *Sophie*, 900 F.2d at 1071 (refusal to hold hearing
> proper where defendant's own submissions refuted his claim).

*Voight*, 89 F.3d at 1067. The burden is on the defendant to establish the need for an evidentiary

hearing, and "[t]hat burden can be met only upon the presentation of definite, specific, detailed,

and nonconjectural facts." *Foster*, 287 F. Supp. 2d at 529 (quoting *United States v. Rodriguez*,

69 F.3d 136, 141 (7th Cir. 1995)); *see also United States v. Blackman*, 407 F. App'x 591, 594-95

(3d Cir. 2011) ("a motion to suppress must be detailed enough to present both a colorable

constitutional claim and disputed issues of material fact that will affect a district court's

resolution of the motion" to warrant a hearing).

In his motions to suppress his statement, Petitioner essentially alleged a simplified

version of the facts that he alleges in his certification: that he was not given *Miranda* warnings,

that he had an injured hand, that he was on painkillers for a back injury, that he requested

counsel several times, and that when he did speak with the DEA agents, they wrote down a

statement which did not mention his answers to their questions. (*See* 07-252 at ECF No. 36 at 8-

10). Thus, Petitioner did allege in his motions what is essentially a colorable *Miranda* claim in

so much as he argued that he had not been provided *Miranda* warnings, and that he had been

both in pain and under the influence of pain killers while giving his alleged statement. Although

the trial court was correct that in both his initial motion and his later pro-se motion to suppress

his statements, Petitioner failed to provide an affidavit or certification in support of his factual

allegations, the substance of the allegations suggests that the best course of action would have

28

been to either provide counsel sufficient time to obtain and present a certification in support of

the motion, or to provide a hearing.  Given the absence of a factual certification, it is not clear

that the trial court erred in refusing to hold an evidentiary hearing, but out of an abundance of

caution, this Court will provide Petitioner with an evidentiary hearing in which he may argue that

his statement should have been suppressed on the basis of the information contained in

Petitioner's certification before this Court.[9]

## 5.  Petitioner's claim that the Government committed improper vouching during summation

Petitioner claims that the Government committed improper vouching in both its

summation and rebuttal summation by arguing that Craig Ford, Agent Post, and Agent Hilton

were credible witnesses.  Vouching occurs where a prosecuting attorney assures a criminal jury

of the credibility of one of the Government's witnesses either through his own personal

knowledge or by reference to other information outside of the testimony before the jury.  *See*

*United States v. Walker*, 155 F.3d 180, 184, 187 (3d Cir. 1998); *see also United States v. Lore*,

430 F.3d 190, 211-12 (3d Cir. 2005).

> A prosecutor's vouching for the credibility of a government witness
> raises two concerns: (1) such comments can convey the impression
> that evidence not presented to the jury, but known to the prosecutor,
> supports the charges against the defendant and can thus jeopardize
> the defendant's right to be tried solely on the basis of the evidence
> presented to the jury; and (2) the prosecutor's opinion carries with
> it the imprimatur of the Government and may induce the jury to trust

---

[9] In granting Petitioner an evidentiary hearing, this Court notes the following: first, in the event
the hearing shows that Petitioner's statement to the DEA should not have been suppressed on the
basis of the testimony of Petitioner and the DEA agents, it is clear that Petitioner would have
suffered no harm as a result of the trial court's refusal to hold an evidentiary hearing; and second
that the hearing itself will be limited solely to the *Miranda* issue.

the Government's judgment rather than its own view of the evidence.

. . . .

Our case law indicates that to find vouching two criteria must be met: (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge or other information not contained in the record. Thus, it is not enough for a defendant on appeal to assert that the prosecutor assured the jury that a witness' testimony was credible. The defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record. It follows that where a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching. Likewise, prosecutorial comment that points to a lack of evidence in the record which supports a defendant's argument that the witness is not credible is proper so long as the comment does not constitute an assurance by the prosecutor that the witness is credible.

*Walker*, 155 F.3d at 184-87; *see also Lore*, 430 F.3d 211-12.

Here, Petitioner asserts that the Government committed improper vouching in two passages quoted above wherein the Government argued that Craig Ford, Agent Post, and Agent Hilton were all credible. Not only did the Government make these arguments in response to the cross examinations of these witnesses, but also either in response to or in anticipation of Petitioner's arguments suggesting either that these three witnesses were not credible or that they had invented Petitioner's statement to the DEA out of whole cloth. Thus, it was appropriate for the Government to comment on and argue that the testimony of these witnesses indicated that they were credible. In making those arguments, the Government commented on matters that were directly before the jury based on the testimony given at trial and pure logic, such as the experience of the officers, the hesitance and need for a subpoena regarding Ford, and the

consistency of the testimony given with the other facts in evidence.  The Government did not

appeal to its own personal knowledge or to information outside the record, and thus these

comments clearly do not constitute improper vouching.  *Walker*, 155 F.3d at 184-87; *see also*

*Lore*, 430 F.3d 211-12.  As such, Petitioner is not entitled to relief on this ground.


**6.  Petitioner's argument that the trial court erred in denying the admissibility of**

**Petitioner's polygraph expert**

Petitioner next argues that the trial court erred by refusing to allow Petitioner to call a

polygraph expert in order to testify that Petitioner's performance on a polygraph indicated that

Petitioner was trustworthy.  In *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 589, 588-89

(1993), the Supreme Court held that expert testimony may be admissible under Federal Rule of

Evidence 702 even where it is not generally accepted in the relevant scientific community so

long as the testimony qualifies as reliable in some other way.  As the trial court noted in this

case, the Third Circuit has yet to take a firm stance on the issue of the admissibility of polygraph

testimony.  *See, e.g., United States v. Lee*, 315 F.3d 206, 214, 214 n. 6 (3d Cir 2003) (noting that

the Third Circuit has not adopted a rule that polygraphs are per se inadmissible but noting that

while some district courts had admitted polygraph evidence, several circuit courts have ruled that

such evidence is inadmissible because it is not reliable).  Notably, most, if not all, of the cases

wherein polygraphs were admitted in the district court preceded the Supreme Court's opinion in

*United States v. Scheffer*, in which the Supreme Court expressed its doubts as to the reliability of

polygraph evidence in ruling that the per se exclusion of polygraphs from military tribunals was

constitutionally proper.  *See* 523 U.S. 303 (1998); *see also United States v. Matusiewicz*, --- F.3d

---, 2015 WL 9305642, at *4-5 (D. Del. Dec. 21, 2015).  Given the lack of a firm ruling by the

Third Circuit on the admissibility of polygraph evidence, *see Lee*, 315 F.3d at 214; the clear trend among other circuit courts finding such evidence unreliable under *Daubert*, *see United States v. Mare*, 668 F.3d 35 (1st Cir. 2012); *United States v. Johnson*, 446 F.3d 272 (2d Cir. 2006); *United States v. Gardiner*, 463 F.3d 445 (6th Cir. 2006); *United States v. Prince-Oyibo*, 320 F.3d 494 (4th Cir. 2003); *United States v. Lea*, 249 F.3d 632 (7th Cir. 2001); and the Supreme Court's ruling in *Scheffer*, the trial court appears to have been entirely justified in ruling that Petitioner's polygraph expert's testimony was not sufficiently reliable, and thus the trial court properly excluded that evidence.  As such, Petitioner's argument here is without merit.

### 7.  Petitioner's Ineffective Assistance of Counsel Claims

Petitioner presents numerous claims in which he asserts that each of the attorneys who represented him at various stages of his criminal proceedings was constitutionally ineffective. The standard for evaluating such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).  To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.  This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).  A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.*  The reasonableness

of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, --- F. Supp. 3d ---, ---, 2015 WL 4742380, at *3-4 (D.N.J. 2015).

**a. Petitioner's claims against Paul Bergrin**

Petitioner first asserts that his original counsel, Paul Bergrin, was ineffective in so much as Bergrin failed to challenge the legality of the search of Petitioner's cell phone during his questioning by the authorities. Petitioner specifically argues that Bergrin's failure to raise such an argument in his motion to suppress shows that Bergrin failed to gain a grasp of the facts and law as they applied to Petitioner's situation. The problem with Petitioner's argument, however,

is that Petitioner consented to the search of his phone.  Even assuming that the state of the law at the time of the search of the cell phone required a warrant for such a search even where incident to a defendant's arrest, *see Riley v. California*, --- U.S. ---, ---, 134 S. Ct. 2473 (2014) (settling the issue that the search incident to arrest exception does not permit the search of a cell phone's data without a warrant or other applicable exception to the warrant requirement), neither probable cause nor a warrant are needed to conduct a search where the subject of the search provides his consent.  *See United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011).  So long as consent is voluntarily given and the person giving consent has the authority to so consent, such a search is reasonable under the Fourth Amendment and does not warrant the exclusion of evidence derived from the search.  *Id.*  Although it must be voluntary, consent "need not be knowing or intelligent, such that it may be given unintentionally and without knowledge of the right to refuse consent."  *United States v. Claus*, 458 F. App'x 184, 188-89 (3d Cir. 2012); *see also United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005) (consent "may be given unintentionally and without knowledge of the right to refuse consent, and the police are not required to warn an individual of the right to refuse consent").

        In his brief in support of his § 2255 motion, Petitioner admits that after he was searched incident to arrest, police found the cell phone in question on his person and asked him to unlock the phone using his private code.  (Document 2 attached to ECF No. 1 at 14).  Petitioner "didn't think nothing of it because he didn't have anything to hide" and thus freely gave the officers the code to unlock his cellphone and access the data contained in the phone, which would certainly include the phone numbers and call history used by the DEA agents in this matter.  (*Id.*).  Petitioner's assertion that he had "nothing to hide" clearly indicates that he understood that providing the unlock code to the agents amounted to implied, if not express, consent to a search

of the phone.  Thus, by Petitioner's own admission he voluntarily gave the DEA complete access

to his cell phone by providing them with the unlock code, and consented to the search to which

he now objects.  Petitioner's only argument in support of his assertion that his consent did not

provide the authority for the police to access his phone and the data contained therein is his

assertion that he "didn't know" that he could refuse to consent to the search of the phone and was

unaware of his rights to "cell phone privacy."  (*Id.*).  Petitioner's lack of knowledge as to his

rights does not retroactively void his voluntary consent to the search of the cell phone, thus the

search of the cell phone was permissible under the Fourth Amendment.  *Claus*, 458 F. App'x at

188-89.  By Petitioner's own admission, the search of the phone was lawful and the failure of

Paul Bergrin to move to suppress the search of the phone could not have been ineffective

assistance of counsel as any such motion would have been without merit.[10]  *United States v.*

*Aldea*, 450 F. App'x 151, 152 (3d Cir. 2011) ("[c]ounsel cannot be ineffective for failing to raise

meritless claims"); *United States v. Berry*, 314 F. App'x 486, 489 (3d Cir. 2008); *Wets v.*

*Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000); *Parrish v. Fulcomer*, 150 F.3d 326, 328-29 (3d Cir.

1998).

  Petitioner next asserts that Bergrin was constitutionally ineffective because of a conflict

of interest that arose because Bergrin was himself under investigation during his representation

of Petitioner.  Petitioner, however, was specifically questioned by Magistrate Judge Shwartz

regarding this potential conflict of interest, and Petitioner chose to continue with Bergrin as his

---

[10] Petitioner raises a substantially similar claim in which he asserts that his later counsel, Mr.
Pedicini, was ineffective for failing to move to suppress the search of the cell phone.  Petitioner's
assertions as to Mr. Pedicini fail for the same reason as those made against Mr. Bergrin: any
motion to suppress the phone evidence would have been without merit, and thus counsel was not
ineffective for failing to make such a motion.  *See Claus*, 458 F. App'x at 188-89; *Aldea*, 450 F.
App'x at 152.

attorney.  (*See* Docket No. 07-272 at ECF No. 9).  As Petitioner chose to proceed with Bergrin following the issue being raised by the magistrate judge, Petitioner cannot now assert a conflict of interest which he chose to waive.  Petitioner has not indicated how he was prejudiced by Bergrin's actions, other than to assert that his cell phone evidence was not suppressed which has been discussed above, or to assert that he suffered a speedy trial delay.  As Petitioner's later counsel both moved for and was granted a dismissal on speedy trial grounds, Petitioner suffered no prejudice as a result of any delay. As Petitioner has not shown any other prejudice which may have resulted from the alleged conflict, Petitioner's conflict claim must also fail as he has not shown he was prejudiced.  *Palmer*, 592 F.3d at 395.

Petitioner also asserts that Bergrin improperly pressured him to plead guilty.  Petitioner, however, did not choose bow to that pressure, and has not alleged any prejudice as a result of the alleged pressure.  As Petitioner has failed to allege any prejudice resulting from improper pressure to plead guilty, and as Petitioner resisted this "improper" pressure, Petitioner has failed to show that he suffered ineffective assistance of counsel as a result.  *Id.*

Petitioner's final allegation of ineffective assistance by Bergrin is his assertion that Bergrin submitted several continuance requests which were not authorized by Petitioner, resulting in violations to Petitioner's right to a speedy trial.  Petitioner, however, does not specify which of the many continuances sought and received in this matter by his attorneys were sought over his objection, if any, nor which continuances were otherwise not wanted by Petitioner. Petitioner has likewise not shown how he was prejudiced by his lawyers' decisions to request continuances other than his assertion that his speedy trial dismissal should have been with prejudice.  As this Court discussed above, Petitioner is incorrect that his indictment should have

been dismissed with prejudice, and this Court cannot conclude otherwise based solely on Petitioner's vague assertion that counsel sought continuances he did not desire.  *Id.*

**b. Petitioner's claims against Zilka Saunders**

Petitioner also asserts that Zilka Saunders, who represented Petitioner on behalf of Bergrin's office, was constitutionally ineffective for failing to obtain discovery, failing to file suppression motions, and for failing to object to the "prosecutorial misconduct" of the Government.  As to Petitioner's assertion that Ms. Saunders failed to file a suppression motion, that claim must fail not only because both Petitioner and his later counsel, James Kimball, did file suppression motions and thus Petitioner was not prejudiced in so much as he was able to present his suppression claims after Ms. Saunders's representation, but also because Paul Bergrin filed a suppression motion prior to his office, and in turn Ms. Saunders, being fired by Petitioner. (*See* Docket No. 07-272 at No. 20).  Petitioner has again failed to show how he was prejudiced by Ms. Saunders's alleged failure to file a suppression motion prior to appointment of Mr. Kimball, and Petitioner's claim in that regard must fail.  *Palmer*, 592 F.3d at 395.

To the extent that Petitioner alleges that Ms. Saunders failed to seek discovery, Petitioner provides no facts as to what discovery, if any, Ms. Saunders failed to acquire, nor how this failure actually prejudiced Petitioner's defense at trial.  Indeed, not only does the record indicate that Petitioner received all of the discovery well in advance of trial, (*see* Docket No. 08-757 at ECF No. 67 at 15-16, 29-30, 34-35), but the Third Circuit on direct appeal determined that there were no discovery violations in this matter and defense counsel was ultimately "not deprived of discovery."  *See Telfair*, 507 F. App'x at 177.  As Petitioner has not alleged what discovery Ms. Saunders failed to acquire, and the record clearly demonstrates that all of the discovery was

provided to Petitioner and his defense counsel well in advance of trial, Petitioner has failed to show prejudice and this claim, too, must fail.  *Id.*

Petitioner's final argument regarding Ms. Saunders is that she failed to object to "prosecutorial misconduct" by the Government.  This argument is connected to Petitioner's stand-alone argument that the Government violated Petitioner's due process rights by "threatening" to prosecute his wife, Catrina Gatling, related to her lying to the Government regarding Petitioner's whereabouts.  Petitioner essentially asserts that the Government committed prosecutorial misconduct in so much as they pressured him to plead guilty by stating that, if he did not do so, they would prosecute his paramour for her part in aiding Petitioner evade arrest.  It is not prosecutorial misconduct, however, for the Government to use the prosecution of a third party as a bargaining chip in plea negotiations so far as the Government observed a "high standard of good faith based upon probable cause to believe that the third party had committed a crime."  *United States v. Mott*, No. , 1998 WL 195712, at *3 (E.D. Pa. Apr. 1998) (quoting *United States v. Whalen*, 976 F.2d 1346, 1348 (10th Cir. 1992)); *see also Bordenkircher v. Hayes*, 434 U.S. 357, 364-65 (1978); *United States v. Hodge*, 412 F.3d 479, 489-92 (3d Cir. 2005) (permitting negotiation of plea deals where prosecutor officers leniency to a third party in exchange for a guilty plea by criminal defendant); *Marin v. Kemp*, 760 F.2d 1244, 1248 (11th Cir. 1985).  Here, Petitioner cannot show that, even if his allegations that the Government told him they would prosecute Ms. Gatling if he failed to plead guilty are true, the Government failed to act with good faith based upon probable cause to believe Ms. Gatling had committed a crime.  Not only did the Government have probable cause to believe Ms. Gatling had committed a crime, but the Government did, indeed, eventually charge and convict Ms. Gatling of making false statements to the DEA in relation to the DEA's attempts to locate

Petitioner.  (*See United States v. Gatling*, Docket No. 10-195 at ECF No. 41).  As the

Government acted in good faith to the extent that they told Petitioner that Ms. Gatling could and

would be charged, and that her career as a prison/jail guard would suffer as a result, Petitioner's

claim of prosecutorial misconduct must fail.  Because Petitioner's underlying claim of

misconduct fails, any motion by Ms. Saunders challenging that conduct would fail, and Ms.

Saunders was not ineffective for failing to make such a motion.  *See Aldea*, 450 F. App'x at 152;

*Berry*, 314 F. App'x at 489; *Wets*, 228 F.3d at 203; *Parrish*, 150 F.3d at 328-29.


**c.  Petitioner's claims against James Kimball**

Petitioner presents numerous claims asserting that his next attorney, James Kimball, was

ineffective.  Petitioner first asserts that, like Ms. Saunders, Kimball did not object to the

Government telling Petitioner during meetings that Petitioner would face a lengthy sentence at

trial and that if Petitioner did not plead guilty, the Government would pursue charges against Ms.

Gatling.  For the reasons discussed above in regard to Ms. Saunders, the argument pertaining to

potential charges against Ms. Gatling fails to demonstrate prosecutorial misconduct, and any

objection to such statements by Kimball would have been meritless.  Likewise, any claim that

the Government was making improper statements by stating that Petitioner faced significant jail

time would be equally meritless.  Any such statements by the Government would have been

absolutely true, and such statements regarding potential jail time are at the heart of any plea

negotiation.  Any objection to those statements by Kimball would have been baseless, and thus

Kimball was not ineffective for failing to raise objections to those statements.  *Aldea*, 450 F.

App'x at 152.  Petitioner also asserts that Kimball was ineffective for failing to object to the

Government transporting Petitioner to a meeting without Kimball's knowledge.  Assuming

*arguendo* that such a meeting took place without Kimball's knowledge, Petitioner has failed to show that counsel's alleged failure to bring the occurrence to the attention to the trial court prejudiced his defense.  As Petitioner has failed to show how he was prejudiced by counsel's failure to object to the alleged meeting, which appears to have terminated as soon as Petitioner asked about the presence of counsel, Petitioner has not shown that he suffered ineffective assistance of counsel.  *Palmer*, 592 F.3d at 395.

Petitioner next asserts that Kimball was ineffective because Kimball's motion to suppress the evidence seized at 185 Parker Street was "unprofessional" and lacked an affidavit from Petitioner in support of the motion.  Petitioner's assertion must fail, however.  Petitioner asserts that the typographical errors and lack of an affidavit prejudiced his motion because, had counsel included them, Petitioner believes the trial court would have found suppression of the evidence "more appealing."  Putting aside the fact that "more appealing" hardly amounts to a likelihood of a better outcome, Petitioner's assertion is incorrect.  The Court of Appeals examined Petitioner's suppression arguments in detail and determined that the search of the Parker Street home was entirely proper given the consent of the women then present in the home and the plain view doctrine.  *See Telfair*, 507 F. App'x at 171-75.  As the Third Circuit held that the trial court acted properly in denying the suppression motions, and determined that the searches and seizures at issue were perfectly lawful, it is clear that correction of the errors Petitioner alleges counsel made would not have affected the outcome of the suppression motion.  As it is clear that it is not at all likely that the outcome of the suppression motion would have changed absent counsel's alleged errors, Petitioner has again failed to show that he was prejudiced, and this claim of ineffective assistance must fail.  *Shedrick*, 493 F.3d at 299; *Cross*, 308 F.3d at 315.

Petitioner also asserts that Mr. Kimball was ineffective in failing to file a proper motion to suppress his statements pursuant to *Miranda*.  As this Court noted in discussing Petitioner's *Miranda* claim, however, Mr. Kimball did, in fact, move to suppress that statement, and in his motion argued many of the bases for suppression Petitioner now presents.  Although Mr. Kimball did not file an affidavit or certification alongside his motion to suppress, which resulted in the trial court refusing to grant an evidentiary hearing, this Court is now granting Petitioner a hearing centered on that very issue based on Mr. Kimball's motion.  Thus, it is clear that Kimball did, indeed, file a motion to suppress the statement which set forth sufficient information in this Court's view to require a hearing, and counsel was therefore not deficient as a result.

Petitioner next asserts that Mr. Kimball was ineffective in so much as he did not object to the second superseding indictment.  Petitioner first asserts that this was ineffective because the second superseding indictment should have been dismissed because it was substantially similar to the indictment dismissed on speedy trial grounds.  The inherent flaw in this argument is that the speedy trial dismissal was without prejudice.  Because that dismissal was without prejudice, it presented no bar to the raising of similar or even identical charges by way of a new indictment so long as a grand jury did so indict Petitioner and the statute of limitations had not passed.  As the grand jury did so indict Petitioner and the statute of limitations had not run, that similar charges were previously dismissed without prejudice would in no way support a dismissal of the second superseding indictment.  As such, any objection by Kimball on that ground would have been meritless, and the failure to make such an objection cannot be ineffective assistance of counsel.  *Aldea*, 450 F. App'x at 152.

Petitioner's second assertion regarding the indictment is that counsel failed to object to the second superseding indictment on the grounds that there was no support in the criminal

complaints for either the amount of heroin charged or for a conspiracy charge.  The intrinsic flaw in this argument is that "there is no requirement that an indictment must parrot the charge contained in a previous complaint; indeed, as a grand jury investigates the mater, it may choose to modify, drop or add charges as it sees fit.  Petitioner is simply incorrect in assuming that his Indictment must be identical to the Complaint." *Munez v. United States*, No. 09-3860, 2010 WL 2925917, at *3 (D.N.J. July 21, 2010).  Both the conspiracy charge and the greater amount of drugs were submitted to the grand jury who based on the presentment of the Government chose to indict Petitioner with the charges in the second superseding indictment.  That the charges indicted were different from those in the criminal complaints, or even different from those in the original indictment, is essentially immaterial.  As the Third Circuit has already upheld the sufficiency of the second superseding indictment, *see Telfair*, 507 F. App'x at 176, and Petitioner's argument regarding the differences between the complaint and its attached affidavit and the eventual indictment is without merit, Petitioner has presented no meritorious ground on which counsel could have stood in challenging the second superseding indictment.  As the objection Petitioner wishes counsel had raised would have been without merit, the failure to raise that challenge is not ineffective assistance of counsel.  *Aldea*, 450 F. App'x at 152.

Petitioner's final argument as to Mr. Kimball is that, like Paul Bergrin, Kimball requested continuances without Petitioner's approval.  Oddly, Petitioner also asserts that Kimball did not request continuances that Petitioner did wish to seek.  As to Petitioner's first argument, to the extent these continuances occurred before the speedy trial dismissal, any prejudice resulting from those continuances Kimball requested would have been undone by that dismissal.  To the extent that they occurred after the filing of the second superseding indictment, both Petitioner's own assertion that Kimball should have requested other continuances and the trial court's observation

42

that Petitioner had repeatedly sought to delay trial both indicate that Petitioner suffered no prejudice from these alleged errors.  In any event, as Petitioner has failed to show how he was prejudiced by Kimball's requesting of continuances or refusals to do so, Petitioner's allegations of ineffective assistance of counsel must fail.  *Shedrick*, 493 F.3d at 299; *Cross*, 308 F.3d at 315.

### d.  Petitioner's claims against Michael Pedicini

Petitioner first asserts that his trial counsel, Michael Pedicini, was ineffective because he allegedly failed to investigate the scene of the Parker Street home.  Petitioner asserts that had Pedicini so investigated, he would have discovered that the "allegations of law enforcement are false because there were not bullet holes in the backdoor of the house." (Document 2 at ECF No. 1 at 43).  Both Pedicini and his investigator, Stephen Novosedlik, have submitted certifications, however, that indicate that Petitioner's factual assertion is incorrect.  Both counsel and the investigator state that Novosedlik was dispatched to the area and not only examined the crime scene, but also interviewed people in the neighborhood in the hope of finding witnesses who could support Petitioner's assertions, but Novosedlik ultimately found nothing to support Petitioner's assertions.  (Documents 1-2 attached to ECF No. 20).  Indeed, the physical evidence submitted at trial, including pictures of the bullet holes in the Parker Street house show that counsel and the investigator are correct and that Petitioner's factual assertions are incorrect.  As Petitioner's assertion is based both on the false assertion that counsel did not investigate the Parker Street location and the false assertion that law enforcement created the crime scene from whole cloth, Petitioner has failed to show that counsel was ineffective for failing to discover these alleged truths, and has certainly failed to show any prejudice.  Petitioner's first claim of ineffective assistance as to Mr. Pedicini therefore cannot be sustained.

Petitioner next asserts that counsel was ineffective when he failed to call three witnesses at trial: Luis Peguero, Jenifer Filpo, and Catherine Sanchez.  Where a petitioner challenges his attorneys decision as to which witnesses to call, courts hearing habeas challenges "are 'required not simply to give [the] attorney[] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as he did.'" *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014).  "*Strickland* requires that a defendant 'overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'  466 U.S. at 689 (internal quotation marks omitted).  If the Government 'can show that counsel actually pursued an informed strategy (one decided upon after a thorough investigation of the relevant law and facts),' the effectiveness of counsel's assistance is 'virtually unchallengable.' *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005)." *United States v. Graves*, 613 F. App'x 157, 159 (3d Cir. 2015).

Petitioner asserts that counsel should have called Peguero as a witness because Peguero would have testified that Filpo and Sanchez lied about his being a supplier for Petitioner and would have revealed their untrustworthiness, and thereby weaken the value of their statements to the authorities.  The problem with Petitioner's assertion about Peguero, however, is that counsel did, in fact, subpoena Peguero.  (Document 1 attached to ECF No. 20 at 3).  Peguero, however, was then under criminal investigation and represented by counsel, who refused to permit Peguero to be interviewed.  (*Id.*).  Thus, Peguero was not available to counsel for interview, let alone to be called a witness.  Given the fact that a Government agent, who was not subject to cross examination on the basis of his criminal record, and who was not unavailable to defense counsel, already provided testimony that Filpo and Sanchez had lied about Peguero, and had lost the benefit of their cooperation agreements with the Government, any testimony regarding those

same issues from Peguero would have been repetitious even if counsel had been able to call

Peguero, whose credibility as a witness is less than clear.  As the only information Peguero could

have provided that would have benefited Petitioner had already been provided by a reputable

witness at trial, and because counsel was barred from interviewing Peguero by Peguero's own

attorney and was therefore unable to gauge the value and risks associated with calling Peguero, it

is clear that not calling Peguero as a witness was the result of informed decision making on the

part of counsel and not an example of deficient performance.  As such, Petitioner's assertion of

ineffective assistance for failure to call Peguero must fail.

Petitioner's assertion that counsel should have called Filpo and Sanchez fairs no better.

In his certification, Pedicini makes clear that he did not call Filpo and Sanchez because, while

Filpo and Sanchez would potentially have testified that they lied about Peguero being

Petitioner's drug supplier, they could have also provided detailed testimony regarding "the

contraband that belonged to [P]etitioner" which was in the Parker Street home.  Counsel thus

believed that, given the fact that testimony regarding their lack of trustworthiness had already

been supplied by a reputable Government agent, the limited value of having them admit to their

lies would have been severely outweighed by the damage Filpo and Sanchez could have done by

testifying further regarding Petitioner's involvement in the drug conspiracy and regarding the

other contraband Petitioner kept in the Parker Street location.  (Document 1 attached to ECF No.

20 at 3).  As such, it is clear that counsel made an informed, reasonable, and strategic decision

not to call Filpo and Sanchez as witnesses, and therefore was not deficient in so deciding.

*Graves*, 613 F. App'x at 159.

Petitioner also asserts that counsel was ineffective in failing to call other, unnamed

witnesses who may or may not have existed who could have shed more light on the shooting at

the Parker Street location.  Petitioner, however, fails to detail who these alleged witnesses were or what they would have said had they been called to testify at trial.  The failure to identify these witnesses and provide any information on what testimony they could have provided is fatal to Petitioner's ineffective assistance of counsel claim.  *See, e.g., Tolentino v. United States*, Civil Action No. 13-4168, 2014 WL 3844807, at *3 (D.N.J. July 31, 2014) ("[a petitioner's] failure to include a sworn statement regarding the nature of [a witness's] proposed testimony is fatal to his making a *prima facie* showing of prejudice"); *see also Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001).  Petitioner provides no more than hypotheticals as to what witnesses may have existed, and what testimony they could have provided, which is utterly insufficient to establish *Strickland* prejudice.  *Id.*  As such, this claim, too, fails to establish a basis for relief.

Petitioner next claims that Pedicini was ineffective in so much as Petitioner alleges that Pedicini failed to provide Petitioner with discovery and failed to go over the discovery in any event.  Both counsel's certification and an extensive colloquy conducted on the record prior to trial, however, indicate that Petitioner was provided with all of the relevant discovery, some of it years before trial, and that Pedicini did his best to explain the discovery to Petitioner, despite Petitioner's difficulties including at least one violent outburst.  (*See* Document 1 attached to ECF No. 20 at 7-8; Docket No. 08-757 at ECF No. 67 at 6-7, 14-41).  Indeed, even after both the trial court and counsel noted that Petitioner's was a straightforward case with little in the way of documentary discovery, the trial court offered Petitioner an opportunity to discuss the discovery with counsel prior to trial, and Petitioner refused stating that such a review would not be helpful. (Docket No. 08-757 at ECF No. 67 at 40-41).  It is therefore clear from the record that Petitioner was provided with all of the relevant discovery, that counsel made efforts to discuss it with him, and that Petitioner himself was responsible for many, if not all, of the difficulties that arose

between himself and counsel in reviewing the discovery.  As Petitioner was clearly provided

with the discovery in this case, and counsel made many attempts to discuss it with Petitioner,

Petitioner's assertion that counsel failed to do precisely that must fail as it is without any support

and is directly contradicted by the record.  As such, this claim, too, fails to establish a basis for

relief.

Petitioner further asserts that Pedicini was ineffective because he failed to object to the

admission of the photo-array identification of Petitioner by Filpo and Sanchez on confrontation

clause grounds.  Even assuming, *arguendo*, that the identification by Filpo and Sanchez of

Petitioner as the owner of the home and operator of the drug mill does run afoul of the

confrontation clause, Petitioner cannot show that he was prejudiced as a result of the admission

of that testimony.  The identification by Filpo and Sanchez here identified Petitioner as the

resident of the Parker Street home and the operator of the drug mill in the basement of that home.

There was more than sufficient evidence adduced at trial to establish this same fact, however,

including the testimony of Petitioner's landlord that Petitioner was the resident of the home who

promised to pay rent through the date of the search; numerous documents attesting to Petitioner's

residence and continued use of the home including bills, identification documents, and other mail

located in the Parker Street home; the testimony of Craig Ford that Petitioner asked Ford to clean

out the Parker Street home and that Petitioner operated the drug mill found therein; and the

testimony of Petitioner's co-conspirators establishing that Petitioner operated as a part of their

drug operations and used the Parker Street location.  Viewed in light of the staggering quantity of

evidence establishing both Petitioner's guilt and his ownership/operation of the Parker Street

drug mill, it is clear that, even had the identification made by Filpo and Sanchez been excluded

from evidence, the result of Petitioner's trial would have been no different.  This is especially

true in light of the fact that the Filpo and Sanchez identification was caveated by the admission by the Government's witnesses that both women had lied and lost the benefit of their cooperation agreements.  Ultimately, because Petitioner cannot show that the suppression of the identification would have likely changed the outcome of his trial, Petitioner has failed to show that he was prejudiced by counsel's failure to object to the identification.  As such, Petitioner's ineffective assistance claim fails.  *Strickland*, 466 U.S. at 694; *Shedrick*, 493 F.3d at 299; *Cross*, 308 F.3d at 315.

Petitioner next argues that Pedicini was ineffective for failing to object to the admission of pages from the ledger of Petitioner's co-conspirators because these documents amount to *Brady* material which should have been provided to the defense prior to trial.  A violation of the rule established in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), occurs where a prosecutor suppresses evidence that is favorable to a criminal defendant which is material to the guilt or punishment of the criminal defendant.  *See United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).  The ledgers at issue here, however, were not in any way favorable to Petitioner, indeed, they clearly supported the testimony of Petitioner's co-conspirators that Petitioner was a part of their conspiracy to distribute heroin.  Thus, even if Petitioner were correct that counsel was not provided two of the three ledger pages submitted by the Government,[11] because they were clearly not favorable to Petitioner, no *Brady* violation would have resulted from their suppression by the Government in this case.  *Id.*  As any objection on *Brady* grounds would have been without merit, counsel's failure to so move cannot form the basis of an ineffective assistance of counsel claim.  *Aldea*, 450 F. App'x at 152.

---

[11] This is by no means clear from the trial transcripts.  The record appears to establish only that counsel did not have two of the pages in his trial binder, not that counsel had never been provided with the document.  (*See* Docket No. 08-757 at ECF No. 69 at 333).

Petitioner also alleges that Pedicini was ineffective for failing to object to the submission into evidence of several recordings of phone calls made by an undercover officer to his co-conspirator, Carlos A. Antigua. The underlying problem with this argument is that counsel did object to the recordings both prior to trial and at trial, (*See* Docket No. 08-757 at ECF No. 67 at 52-54, Docket No. 8-757 at ECF No. 69 at 342-53), and, indeed, after one of the recordings was played, the trial court also raised an issue as to the audibility, clarity, and fundamental fairness of the admission of the tapes and the transcripts the Government had made of those tapes.  (*See* Docket No. 08-757 at ECF No. 69 at 342-53).  Based on the objection and the Court's own observation that the tapes were virtually inaudible and unduly prejudicial under the circumstances, the trial court excluded the recorded phone calls, the transcripts of those calls, and a video of Antigua meeting with a Government agent.  (*Id.*).  As counsel did object to this evidence, and, indeed, the Court did ultimately suppress the evidence, Petitioner did not receive ineffective assistance of counsel in relation to the recordings.[12]

Petitioner next asserts that counsel was ineffective when he failed to adequately oppose the introduction of certain hearsay statements arising out of a conversation between Carlos A. Antigua and a federal agent concerning a heroin transaction which occurred after Petitioner had been arrested.  Petitioner asserts that because counsel did not adequately oppose this line of questioning, the prosecution was able to inject unacceptable hearsay testimony into Petitioner's trial, resulting in his conviction.  Petitioner's factual assertions, however, are incorrect.  It is clear from the trial transcripts that Pedicini objected to the entire line of questioning concerning

---

[12] Although one of the recordings was played in the presence of the jury, both counsel and the trial judge note that the tapes were inaudible and it wasn't clear what was being said.  The playing of that tape, absent a transcript which the trial court excluded, was at worst harmless to Petitioner as a result, and Petitioner certainly cannot show that he was prejudiced by the playing of an inaudible tape.

Antigua's conversations with agents regarding heroin deals after Petitioner's arrest.  (Docket No. 08-757 at ECF No. 69 at 355-56).  Initially, the trial court agreed with Pedicini that the information the Government sought to elicit was inappropriate and should be excluded both as hearsay and as unfairly prejudicial.  (*Id.* at 356-60).  Although the Government vehemently opposed this ruling, and the trial court ultimately stated that it would allow the Government to continue the line of questioning at its own peril, specifically at risk of a reversal on appeal, the trial judge's warning ultimately led the Government to abandon the line of questioning at issue. (*Id.* at 360-66).  The Government thereafter ceased asking questions about the conversation between Antigua and federal agents, and instead simply asked whether he had met with federal agents acting under cover and ultimately been arrested.  (*Id.* at 366-68).  It is thus clear from the record that Pedicini vigorously opposed the line of alleged hearsay questioning Petitioner calls into question, and that this opposition ultimately convinced both the trial judge of the impropriety of the line of questions and the Government of the riskiness of continuing with that line.  Thus, even if the trial court did not exclude the questioning at hand, as a result of Pedicini's objection the Government abandoned the questioning Petitioner now decries, and it is clear that counsel was not ineffective, nor was Petitioner prejudiced as a result.[13]  Petitioner's claim of ineffective assistance therefore fails.

      Petitioner's final claim asserting that Pedicini was constitutionally ineffective asserts that Pedicini failed to cross examine Agent Greimel regarding both whether Greimel was present at Plaintiff's arrest and whether Petitioner was properly given *Miranda* warnings and to cross

---

[13] Likewise, because the Government abandoned this line of questioning and ultimately decided against eliciting the alleged hearsay testimony, it is clear that the Government did not commit prosecutorial misconduct by attempting to inject inadmissible hearsay into Petitioner's trial as Petitioner attempts to claim.

examine Carlos Antigua about who initiated the call between Antigua and the Government.  As to Greimel, Greimel clearly testified that he was not present during Petitioner's arrest and initial questioning as he was ill on the day in question.  There is nothing in the record to suggest otherwise, and Petitioner presents only his own assertion to support his claim that Greimel was present during his arrest and questioning.  Both Greimel's testimony, and the testimony of Agent Post who arrested Petitioner and gave him his *Miranda* warnings clearly supports the fact that Petitioner was given the warnings, and that it was Post, rather than Greimel, who questioned Petitioner.  Thus, the record suggests that had Greimel been confronted with Petitioener's claim on cross-examination regarding where Greimel was during Petitioner's arrest and whether Petitioner was given proper *Miranda* warnings, Greimel would have testified in accord with his own prior testimony and that of Post: i.e. that Greimel was not present for the arrest, but that Petitioner was given proper *Miranda* warnings by Post.  Nothing in the record suggests Greimel would have answered otherwise, and thus the record establishes that Petitioner would have gained nothing from cross examination on that subject, and thus Petitioner was not prejudiced by counsel's "failure" to cross-examine Greimel or the other agents on that subject.

Turning to Carlos Antigua, Petitioner suggests counsel should have asked him and the relevant federal agents whether it was the agents or Antigua who initiated the phone call that ultimately resulted in the arrest of Antigua.  The testimony of Agent Hilton, however, clearly established that it was Antigua who placed the call, and Hilton was asked to answer the call and pretend to be a member of Petitioner's drug operation.  As such, the record clearly suggests that both Antigua and the agents, had they been cross examined on the subject, would have stated that it was Antigua who placed the call.  Petitioner's assertion otherwise, without an affidavit from Antigua or the agents to suggest that they would have testified that the agents made the call, is

insufficient to show that anyone would have testified that federal agents placed that call.  As the record indicates that Petitioner's assertion is incorrect, Petitioner was not prejudiced by counsel's failure to cross examine Antigua and the agents on this topic.[14]  As Petitioner has failed to show that he was prejudiced by counsel's cross-examinations of these witnesses, this claim of ineffective assistance also fails to establish a basis for relief.

**e.  Petitioner's claims against John Azzarello**

Petitioner finally asserts that his sentencing and appellate counsel, John Azzarello was constitutionally ineffective for failing to raise the arguments in his § 2255 motion on appeal, and because he was held accountable at sentencing for higher drug quantities than his co-conspirators and was sentenced on the basis of information that was presented in the PSR, but was not found by the jury.  Turning first to Petitioner's sentencing argument, it is clear that Petitioner's ineffective assistance argument is without merit.  Petitioner's assertion that counsel was ineffective because counsel did not object to the fact that Petitioner was sentenced on the basis of a higher quantity of heroin than his co-conspirators fails to account for the fact that his co-conspirators, the Antigua brothers, both pled guilty pursuant to plea agreements, cooperated with the Government, and received Government motions for a downward departure on that basis. Thus, while Petitioner went to trial and was thus bound by the testimony at trial as to the quantity of drugs involved, his co-conspirators made plea deals with the Government stipulating to different drug quantities and were sentenced based on those quantities as a result.  The amount of

---

[14] Even had the agents or Antigua testified otherwise, such testimony would have been of little, if any value, as the remaining testimony of Antigua would still clearly indicate that Petitioner was involved in the drug conspiracy at issue in his indictment, and thus what prejudice Petitioner would have suffered even if he could show Antigua would have testified that the agents initiated the call is, at best, unclear.

drugs contained in Petitioner's PSR, and on which he was ultimately sentenced, however, stems directly from the testimony given at trial including Petitioner's statement to the DEA and the testimony of the Antigua brothers.  Thus, there was a clear basis for the quantities which were ascribed to Petitioner, and thus any objection to those quantities on the grounds Petitioner raises would have been without merit, and counsel's "failure" to object to those quantities would have been without merit.

Likewise, to the extent that Petitioner alleges that these quantities were not found by the jury, he misunderstands the law.  While a jury must find beyond a reasonable doubt those facts which alter the minimum and maximum statutory sentence applicable to an offense, a judge may determine those facts which only affect the judge's imposition of a sentence within the statutory sentencing range.  *See, e.g., Apprendi v. New Jersey*, 530 U.S. 466 (2000); *see also Alleyne v. United States*, --- U.S. ---, 133 S. Ct. 2151 (2013).  Here, the jury found beyond a reasonable doubt the one fact which determined the applicable statutory minimum and maximum sentence: that Petitioner's conspiracy involved a quantity over one kilogram of heroin.  Thus, a jury was not required to find the exact amount, and it was not error for the trial judge to determine the appropriate amount via the PSR, and an objection on that basis by counsel would have been without merit.

In any event, Petitioner cannot show he was prejudiced by counsel's representation at sentencing because counsel's actions at sentencing clearly led to Petitioner being sentenced to at least ten years less prison time than recommended by the PSR's guidelines determination.  Here, Petitioner, due in part to his criminal history, was subject to a recommended guidelines range of thirty years to life.  Due to counsel's arguments that Petitioner's history was overstated, the sentencing judge was convinced that Petitioner should receive a downward variance.  Thus,

counsel secured for Petitioner a sentence of twenty years, significantly below the relevant guidelines range.  As Petitioner received a sentence well below the guidelines range as a result of counsel's arguments to the sentencing court, and the objections Petitioner now raises are without merit, it is clear Petitioner was not prejudiced by counsel's performance at sentencing.  As such, Petitioner's first claim against Azzarello must fail.

Petitioner's final claim is that Azzarello was ineffective when he did not raise the issues contained in Petitioner's § 2255 motion on direct appeal.  As this Court has shown above, the claims Petitioner raises in his motion are clearly without merit save for Petitioner's *Miranda* claim, and whatever merit that claim now has arises mostly out of facts outside the record provided in Petitioner's affidavit attached to his § 2255 motion.  Given the fact that Petitioner's claims lack merit on the basis of the trial record alone, and given the fact that the Third Circuit determined on direct appeal not only that both Petitioner's pro se filings and counsel's *Anders* brief failed to raise any meritorious claims on appeal, but also that there were no non-frivolous bases for appeal in Petitioner's case, it is clear that Petitioner was not prejudiced by counsel's actions on direct appeal.  *See Telfair*, 507 F. App'x at 171-79.  Thus, as with all of Petitioner's ineffective assistance claims, this claim does not present a basis for relief.

### 8.  Petitioner's Motion for Release on Bail Pending this Court's resolution of his § 2255 motion

Petitioner also moves this Court to grant him release on bail pending the resolution of his motion to vacate his sentence.  Bail pending the disposition of a habeas petition or motion to vacate is available "only when the petitioner has raised substantial claims upon which he has a high probability of success or exceptional circumstances exist which make a grant of bail

necessary to make the habeas remedy effective." *See Pelullo v. United States*, 487 F. App'x 1, 3 (3d Cir. 2012) (quoting *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992)).  Exceedingly few cases present the sort of extraordinary circumstances which would warrant grant of bail pending habeas review.  *Landano*, 970 F.2d at 1239.  The sorts of cases which do present such circumstances include those where a petitioner was gravely ill and approaching total blindness, and where a petitioner's sentence was so short that without bail pending review success in the petitioner's habeas petition would have been of virtually no value to the petitioner.  *Id.*

Here, Petitioner has neither presented a substantial claim with a high probability of success, nor extraordinary circumstances.  As to Petitioner's claims, only one is even of arguable value – his *Miranda* claim.  Even in that claim, however, Petitioner fights an uphill battle in so much as his assertions run counter to the trial testimony of several federal agents and of the corroborating testimony provided by a childhood friend and his co-conspirators.  It is thus by no means highly likely that Petitioner will succeed on even his *Miranda* claim.  Likewise, in his motion Petitioner presents no extraordinary circumstances which would merit a grant of bail pending a hearing on his *Miranda* claim.  Petitioner has thus failed to show any basis for this Court to find that he should be released on bail pending the outcome of his motion to vacate his sentence.  As such, Petitioner's motion for release on bail pending the outcome of his current motion must be denied.  *Pelullo*, 487 F. App'x at 3; *Landano*, 970 F.2d at 1239.

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c) the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could

conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  As to all of Petitioner's claims other than his *Miranda* claim, Petitioner has failed to make a substantial showing of the denial of a constitutional right, and jurists of reason could not disagree with this Court's determination that Petitioner's non-*Miranda* claims are without merit.  As such, this Court will deny Petitioner a certificate of appealability as to all of his non-*Miranda* claims.

**V.  CONCLUSION**

For the reasons set forth above, Petitioner's motion for the appointment of counsel is GRANTED, Petitioner's request for an evidentiary hearing is GRANTED solely as to Petitioner's *Miranda* claim, Petitioner's motion to vacate is DENIED as to all of Petitioner's remaining grounds for relief, Petitioner's motion for release on bail is DENIED, and Petitioner is DENIED a certificate of appealability as to all of his non-*Miranda* claims.  An appropriate order follows.


February 17, 2016          __*s/ Susan D. Wigenton*_____
                                       Hon. Susan D. Wigenton
                                       United States District Judge