# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| TOMMIE TELFAIR, | : |
|           Petitioner, | :   Civil Action No. 13-6585 (SDW) |
| v. | :   **OPINION** |
| UNITED STATES OF AMERICA, | : |
|           Respondent. | : |

**WIGENTON**, District Judge:

Presently before the Court is the sole remaining claim presented in the motion to vacate sentence of Petitioner, Tommie Telfair. (ECF No. 1). Petitioner filed his motion on or about October 25, 2013. (ECF No. 1). The Government filed a response (ECF No. 20), to which Petitioner replied. (ECF Nos. 24-25). Following briefing and several other motions, this Court entered an order and opinion denying all of Petitioner's claims except for his claim that his statement was taken in violation of his *Miranda* rights, and denied Petitioner a certificate of appealability as to his non-*Miranda* claims. (ECF Nos. 36-37). This Court thereafter held an evidentiary hearing as to Petitioner's *Miranda* claim on August 3, 2017. (ECF No. 57). For the following reasons, Petitioner's sole remaining claim is denied, and Petitioner is denied a certificate of appealability.

## I. BACKGROUND

As this Court presented an extensive summary of the factual background of this matter in its previous opinion, (ECF No. 36 at 1-18), it need not repeat that endeavor here. Instead, only those facts and allegations which are relevant to Petitioner's *Miranda* claim will be recounted. In

that opinion, this Court provided the following summary of the allegations Petitioner had made in his initial motion regarding his *Miranda* claim:

> [i]n the affidavit attached to his § 2255 motion, . . . Petitioner presents [allegations which contradict the trial testimony of the various federal agents involved in this case]. (Document 1 attached to ECF No. 1 at 4-7). Petitioner alleges that it was Agent Greimel, and not Agent Post, who interviewed Petitioner, despite the fact that Greimel testified at trial that he was not present during the arrest or questioning of Petitioner. Petitioner asserts that he told the agents he was in pain and on the way to the doctor, but was instead arrested and immediately placed in handcuffs, contrary to testimony by Agent Post that Petitioner was not handcuffed until he was taken to the DEA office in Newark. Petitioner asserts that he was thereafter threatened with the prosecution of his wife if he did not cooperate. Petitioner asserts that he refused to cooperate with the DEA, and was never provided with *Miranda* warnings. Petitioner further asserts that when he refused to cooperate, Agent Greimel insisted that Petitioner would either give a statement, or one would be forged to incriminate Petitioner. Petitioner alleges that he continued to refuse, and the agents therefore forged his statement and arrested his wife. Petitioner further asserts that, to the extent that he did answer questions asked by an Agent Thomas, the agents recorded false answers which in no way reflected the statements that Petitioner gave. Petitioner further asserts that he requested an attorney, but was denied one by the DEA agents. Petitioner finally asserts that, during a lull in the questioning, he heard his wife being questioned in another interrogation room, including insults hurled at Petitioner by the questioning agent. Thus, Petitioner contends that he never received *Miranda* warnings, was in constant pain from an injured hand being handcuffed, was the subject of attempted coercion by Agent Greimel, and in any event never made the statement used against him at trial. (*Id.* at 4-8).

(ECF No. 36 at 25-26).

As the Court explained in its prior opinion, the trial testimony of the various federal agents directly contradicted Petitioner's account. (*Id.* at 24-25). At trial, DEA Agent John Post testified that, on the day of Petitioner's arrest, he and his fellow agents approached Petitioner as he was exiting his home at approximately 3 p.m., that Post identified himself, told Petitioner he was under arrest, and asked Petitioner if he wished to speak with them. (*Id.* at 12). Post testified that Petitioner

was "very cooperative," and led the agents to the door of his home, unlocked the door and entered a code into an alarm system, and thereafter was cooperative. (*Id.*). Post further testified at trial that Petitioner was given *Miranda* rights, stated that he understood those rights, was "very lucid [and] very cooperative" and gave no indication that he didn't understand, was injured, needed to see a doctor, or was otherwise impaired. (*Id.* at 12-13). Post also testified at trial that Petitioner was not handcuffed until later, when he was taken to the DEA's Newark office. (*Id.* at 13). Petitioner thereafter provided them the statements that were used against him at trial. (*Id.*). DEA Agent Gregory Arthur Hilton also testified at trial, that Petitioner gave further information at the DEA's office in Newark. (*Id.* at 11).

At Petitioner's § 2255 hearing, three DEA agents testified regarding their involvement in Petitioner's arrest and interview – Agent Post, Agent Joseph Thompson, and Agent Greimel. In his testimony at the hearing, Agent Post largely reiterated the testimony he had provided at trial. Specifically, Agent Post testified that Petitioner was arrested outside of his home following surveillance of his address. (Hearing Tr. at 7-9). Post stated that, at about 3 p.m., he and his fellow agents observed Petitioner leaving his home with keys in hand; the agents then approached him, identified themselves, and informed him he was under arrest, although they did not then handcuff him. (*Id.* at 8*)*. Post testified that Petitioner then stated that he wished to cooperate, and led the agents into his residence after Petitioner unlocked the door and turned off the alarm system. (*Id.* at 9). Post then read Petitioner his *Miranda* rights, which Petitioner stated he understood and agreed to waive by speaking with the agents. (*Id.* at 10). Post also testified that Petitioner was cooperative and appeared to have no difficulty understanding, that Petitioner did not appear in pain or injured, and that Petitioner never told Post he was injured, in pain, or otherwise incapacitated. (*Id.* at 10-11). Post then testified as to the taking of Petitioner's statement, providing information

3

essentially in accord with his trial testimony. (*Id.* at 11-19). Post also testified that Petitioner never asked for a lawyer while speaking to Post, that Petitioner was never threatened or otherwise coerced, and that Petitioner's girlfriend was eventually arrested and pled guilty to harboring a fugitive in relation to her harboring Petitioner. (*Id*. at 19-21). On cross-examination, Post admitted that he did not follow DEA manual interrogation rules to the letter, and admitted that he had not previously read the relevant sections of the DEA manual, but had been well acquainted with and followed the Court's *Miranda* requirements in dealing with Petitioner. (*Id.* at 22-35). Agent Post on cross-examination also stated that while Petitioner had mentioned Paul Bergrin as having been his attorney in relation to a written real estate document, Petitioner never asked to speak with, contact, or otherwise consult with Bergrin in relation to his arrest at that time.[1] (*Id.* at 38-40).

DEA Agent Joseph Thompson then testified at Petitioner's § 2255 hearing. (*Id.* at 41). Agent Thompson testified that he was present during Petitioner's arrest and was "in and out of" the room while Agent Post was interviewing Petitioner. (*Id.* at 47). Agent Thompson testified that he heard Post provide Petitioner with *Miranda* warnings at his home, and overheard parts of Petitioner's statement to Post, although Post did not read the rights from a DEA issued card and instead provided them from memory. (*Id.* at 52). Thompson also testified that he eventually took over the interview from Agent Post after the return to the DEA's Newark Office. (*Id.* at 43-47). Thompson further stated that Petitioner was cooperative during the interview, that Petitioner never advised he was in pain, never complained of any injury, and "seemed coherent." (*Id.* at 43-44). Thompson testified that Petitioner never took a note pad from him as had been alleged by

---

[1] Although Agent Post testified that, to his recollection, Bergrin was not retained in Petitioner's criminal case, Petitioner did in fact hire Bergrin, although Bergrin himself only briefly represented Petitioner, and was not Petitioner's attorney when Post testified at Petitioner's trial. (*See* ECF No. 36 at 34-50). That Post was unaware that Bergrin did briefly act as Petitioner's attorney is therefore of no moment.

4

Petitioner, and that although Petitioner refused to sign a written statement, that was not uncommon as even cooperative individuals "almost . . . never" sign statements for fear that a written, signed statement could endanger them with other criminals. (*Id.* at 44-46). Following Thompson's testimony, the Government also called Agent Matthew Greimel, who testified that he was not involved with Petitioner's arrest as he was "out sick" the day of the arrest, a statement which Greimel supported with his time sheet records. (*Id.* at 78-83).

Petitioner thereafter testified on his own behalf at the hearing. Petitioner stated that, at the time of his arrest, he was on his way to the doctor to have an injured hand attended to, and that he had unrelated back injuries at the time. (*Id.* at 84-85). Petitioner also testified that he had been on Tylenol with codeine and a medication called Methocarbamol at or around the time of his arrest, and that he had filled the prescription for those medicines in the beginning of January 2007. (*Id.* at 88). Petitioner further testified that, while taking those medications, he felt "tranquilized," that he couldn't drive, couldn't operate machinery, and felt "tired and super, super duper high." (*Id.* at 89). In addition to testifying as to the medication he had allegedly taken, Petitioner stated that he had never been given *Miranda* warnings during his arrest. (*Id.* at 93).

When confronted with the allegations in his affidavit on cross examination, a subject Petitioner did not discuss on direct examination, Petitioner stated that he couldn't recall whether the affidavit was accurate as it had been a considerable period of time, and some of his court filings had been prepared on his behalf by others. (*Id.* at 97). Petitioner further stated that he couldn't remember all that he had put into his affidavit, although he remembered signing and submitting it. (*Id.* at 97-101). Petitioner also stated that, aside from human error the affidavit "should be correct." (*Id.* at 101). Petitioner admitted, however, that although he had originally named Agent Greimel as the agent who accosted him that he "didn't know whose name went to whose face" when he

wrote the affidavit, and expected the Government to "correct" him as to the inaccuracies in his own affidavit. (*Id.* at 102). Petitioner then testified that he couldn't remember whether it was Greimel or another agent who allegedly threatened and accosted him. (*Id.* at 103). Petitioner thereafter testified that he couldn't remember much of what happened, and could not guarantee the accuracy of his prior allegations, but was certain he had not been *Mirandized*. (*Id.* at 103-109).

Petitioner thereafter called Dr. Alberto Mario Goldwaser to testify regarding the mental effects of the medications Petitioner claims he had taken on the day of his arrest. (*Id.* at 109). Dr. Goldwaser essentially testified that the drugs which Petitioner had been prescribed, including a muscle relaxant, Methocarbamol, and a pain killer, Tylenol with codeine, both had the potential to make Petitioner tired and slow his mental functions. (*Id.* at 126). According to various medical sources, the doctor testified that the two drugs could cause drowsiness, sedation, dizziness, or the like. (*Id.*). Based on Petitioner's medical records and these prescriptions, Dr. Goldwaser testified that, "[h]ad [Petitioner] taken his medication," the doctor would conclude "to a reasonable degree of medical probability"[2] that Petitioner's judgment "wouldn't be as sharp" and Petitioner would be "very easily convinced" to do thing to which he otherwise was not predisposed. (*Id.* at 130-31). The doctor, however, was not present, and thus couldn't determine whether the medication was taken, or if it had actually had any such effects upon Petitioner. (*Id.* at 131, 138-39).

---

[2] In his report, the doctor in multiple incidents couched his conclusions as being within a reasonable degree of medical probability rather than medical certainty. (*Id.* at 131). In his testimony, the doctor equivocated between the two standards, stating that his conclusions were "with a reasonable degree of medical probability or certainty." It thus did not appear that the doctor fully appreciated the difference between the two.

6

## II. DISCUSSION

### A. Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

### B. Analysis

#### 1. Credibility Determinations

Having held an evidentiary hearing in this matter, and having had the opportunity to observe the demeanor and testimony of the witnesses at the hearing, this Court makes the following credibility determinations. Turning first to the three DEA Agents, this Court found the testimony of Agents Post, Thompson, and Greimel to be highly credible. Each agent was responsive to

questioning from both Petitioner and the Government, and each testified to facts which were, in all relevant respects, in accordance with the trial testimony of Post, Greimel, and Agent Hilton. Although Agents Post and Thompson did have some difficulty remembering certain facts and had to have their reflection refreshed as to certain details of Petitioner's statements, these gaps as to those details are more than understandable given the more than ten year gap between the events in question and the hearing in this matter. As all three agents were direct and forthcoming, even as to Agents Post and Thompson admitting their lack of familiarity with certain portions of the DEA manual, their testimony was credible and reliable.

Petitioner also testified at the hearing, but was less than a credible witness. While Petitioner was forthcoming with his own attorney on direct examination, he was in large part argumentative with the Government, seeming only able to recall those memories of his arrest which weighed in his favor. In contrast, Petitioner's memory was full of convenient gaps concerning those areas favorable to the Government. Importantly, Petitioner failed to testify at the hearing to most of the controversial facts from his affidavit which led the Court to hold a hearing in this matter. Petitioner admitted that his allegations developed over time and that he did not know which agents in fact had actually been involved in his arrest and interrogation, despite the apparent certainty that Agent Greimel had been his malefactor presented by his initial affidavit. Petitioner's version of events thus seems to be fluid, but firmly contradicted by the credible testimony of the agents as discussed above. This Court likewise finds incredible Petitioner's assertion that he was either intoxicated by his medications or pain, especially in light of the fact that Petitioner admits he was preparing to drive at the time of his arrest. However, Petitioner testified at the hearing that his medications, if taken, would have left him "tranquilized" and

incapable of operating his vehicle. Having observed Petitioner's demeanor, testimony, and responsiveness to questioning, this Court finds Petitioner's testimony inconsistent and unreliable.

Finally, the testimony of Dr. Goldwaser, while not necessarily incredible, was of little value to this Court's determinations. Even putting aside the doctor's equivocation between medical probability and certainty, the doctor was, at best, able to say only how the medication Petitioner was prescribed *could* have affected him, and even then only if he had taken it prior to his leaving the house on the date of his arrest. The doctor could not testify as to whether the medication had such an effect on Petitioner himself. Thus, his testimony was entirely too speculative to be of any meaningful assistance in determining a fact in issue – specifically Petitioner's competency to waive his *Miranda* rights. *See generally* Fed. R. Evid. 702 (permitting consideration of expert testimony only when that testimony "will help the trier of fact to understand the evidence or to determine a fact in issue"); *United States v. Delgado*, 677 F. App'x 84, 86 (3d Cir. 2017) (expert evidence properly admitted for consideration only where the testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute," requiring that expert testimony be more than merely relevant).

**2. Petitioner's *Miranda* Claim**

In his sole remaining claim, Petitioner asserts that, because he was not given *Miranda* warnings, the trial court erred in failing to suppress his statement.[3] As this Court previously explained,

> [u]nder *Miranda*, any statement made by a criminal defendant during custodial interrogation is inadmissible at trial unless the defendant was provided *Miranda* warnings and "in fact knowingly

---

[3] Importantly, Petitioner maintains that he never gave any statement. This Court finds that assertion unreliable.

9

> and voluntarily waived [his *Miranda*] rights when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010). "The waiver inquiry has two distinct dimensions: waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotations omitted). Waiver need not be made by express or formal statements, but may be made by implication so long as the facts establish that the defendant was informed of his right[] to counsel and [right to] remain silent, understood those rights, and voluntarily made a statement having that understanding. *Id.* at 383.

(ECF No. 36 at 24).

Based on the testimony of Agents Post and Thompson at the evidentiary hearing, it is clear that Petitioner was given *Miranda* warnings prior to his interrogation by the agents. Moreover, it is also clear that Petitioner was cooperative and appeared to understand the warnings he was given. The credible testimony in the record also establishes that Petitioner never complained of pain, never appeared to be or stated that he was under the effects of any medication, and never stated he was on his way to see a doctor. This Court therefore finds that Petitioner's waiver of his *Miranda* warnings was knowing and voluntary. Petitioner chose, of his own free will, to give the statements which were used against him at his trial after being informed of and choosing to waive his *Miranda* rights.

There is no credible evidence in the record of the coercion, threats, or other misdeeds that Petitioner asserted in his affidavit. Petitioner's waiver of his rights was made "with full awareness of both the nature of the right [he chose to] abandon[] and the consequences" of his decision to waive his rights. *Berghuis*, 560 U.S. at 382-83. Petitioner's recent contention that he requested, but was denied, a lawyer is without merit. Agents Post and Thompson credibly testified that while Petitioner may have mentioned Paul Bergrin as having represented him in other matters, Petitioner did not invoke his right to counsel prior to the end of his interrogation. As this Court finds that

10

Petitioner's waiver of his *Miranda* rights and decision to give the agents a statement was knowing and voluntary, the trial court did not err in refusing to suppress Petitioner's statements. Likewise, to the extent Petitioner asserted the trial court erred in refusing to hold a hearing on Petitioner's suppression motion, any such error that may have existed was in all respects harmless in light of the present determination that Petitioner was given and thereafter knowingly and voluntarily waived his *Miranda* rights. *See Fry v. Piller*, 551 U.S. 112, 116 (2007) (on collateral review, even constitutional errors will be considered "harmless unless [they] had a substantial and injurious effect" on the outcome of criminal proceedings); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007), *cert. denied*, 552 U.S. 1108 (2008).

### III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c) the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As Petitioner's sole remaining claim – his *Miranda* claim – is patently without merit, Petitioner has failed to make a substantial showing of the denial of a constitutional right, and jurists of reason could not disagree with this Court's resolution of that claim. Petitioner shall therefore be denied a certificate of appealability.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's sole remaining claim is DENIED and Petitioner is DENIED a certificate of appealability. An appropriate order follows.


Dated: September 25, 2017                    *s/ Susan D. Wigenton*
                                             Hon. Susan D. Wigenton
                                             United States District Judge